**UNITED STATES of America,**
**Plaintiff,**

v.

**D–1 Alan MIKELL, D–2 Christopher Grisel, Defendants.**

No. 97–CR–81493.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 24, 2001.

James A. Brunson, U.S. Attorney's Office, Bay City, MI, for Plaintiff.

Harold Z. Gurewitz, Gurewitz & Raben, Detroit, MI, David B. Herrington, Bad Axe, MI, for Defendants.

## ORDER GRANTING DEFENDANTS' VENUE MOTIONS; GRANTING DEFENDANTS' MATERIALITY MOTIONS; DENYING AS MOOT DEFENDANTS' MOTION FOR MISTRIAL; DENYING AS MOOT DEFENDANT GRISEL'S MOTION TO REPLACE COUNSEL; DENYING AS MOOT DAVID HERRINGTON'S MOTION TO WITHDRAW AS COUNSEL; AND DENYING AS MOOT PLAINTIFF'S MOTION SEEKING RESOLUTION OF RULE 29 MOTIONS AND OTHER MATTERS

CLELAND, District Judge.

Pending before the court are the following motions by Defendants Alan Mikell and Christopher Grisel:[1] (1) "Motion for Judgment of Acquittal or in the Alternative for Arrest of Judgment (Venue)" ("Venue Motions"), filed on June 29 and July 20, 1999 respectively; (2) "Motion for Judgment of Acquittal Pursuant to Rule 29(c) FRCrP and for Arrest of Judgment Pursuant to Rule 34 FRCrP" ("Materiality Motions"), filed on June 29, 1999 and July 20, 1999 respectively; and (3) "Motion for Mistrial for Denial of Right of Counsel and for Mistrial" (Green & Purtell), filed on April 26, 1999. Also pending before the court are (1) Grisel's "Motion to Replace Counsel," filed on November 17, 1999, (2) David Herrington's[2] "Motion to Withdraw as Counsel," filed on November 17, 1999, and (3) Plaintiff United States of America's ("Government's") "Motion Seeking Resolution of Rule 29 Motions and Other Pending Matters," filed on August 6, 2001. For the

---

1. Defendants filed virtually identical motions for each request for relief.

2. David Herrington is representing Grisel in this action.

reasons set forth, the court will grant Defendants' Venue and Materiality Motions, while denying the remaining motions as moot.

## I. BACKGROUND

During all relevant times, Defendants owned Real Pinconning Cheese ("RPC") in Pinconning, Michigan.[3,4] On September 26, 1995, RPC entered into an agreement to purchase milk from National Farmers Organization Dairy Custodial Account ("NFO"). Because RPC already owed NFO approximately $1,000,000 for previously shipped milk, NFO only agreed to ship additional milk under certain conditions: namely, a collateral pledge and security agreement whereby RPC could be held in default for failure to remain current on milk payments and whereby NFO could obtain a security interest in RPC's cheese inventory.

By January 1996, RPC owed NFO approximately $2,400,000 (including the previous $1,000,000 debt) for unpaid milk invoices. NFO then notified Defendants that it was holding RPC in default and exercising control of the collateral, that is, approximately 771,338 pounds of cheese which was then warehoused at, and/or in transit to, Pinconning.

After receiving formal notification that they were being held in default, Defendants devised a scheme whereby they could avoid their obligations to NFO without themselves suffering financially. First, Defendants sold the cheese to Nor-Tech Dairy Advisors, Inc. ("Nor-Tech"), which was owned by Ronald Hines.[5] Although the Pinconning cheese was almost entirely grade "A," and thus at the time worth approximately $1.35 to $1.40 per pound, Defendant sold the cheese to Nor-Tech at $0.25 per pound. A companion agreement required Hines to quickly resell the cheese back to Grisel's company Innoquest for $0.30 per pound plus shipping costs. Grisel, through Innoquest, then resold the cheese to a company called Sorrento at $1.40 per pound and a second entity named E.J. Marketing for an average of $1.36 per pound. RPC was only required to pay NFO the money from the initial sale of cheese to Nor-Tech, which was priced at $0.25 per pound and not at the market value then prevailing.

In an effort to conceal the transaction between Hines and Innoquest, Grisel directed Sorrento and E.J. Marketing to send the majority of payments for the cheese to Nor-Tech, rather than to Innoquest directly. Hines then forwarded this money to Innoquest, who disbursed some of the money to Mikell and others.

As a result of the above stated actions, a grand jury charged Defendants in a fifty-two count Second Superseding Indictment with, among other things, mail fraud, wire fraud, and money laundering. After a lengthy trial, the jury returned a guilty verdict against Defendants on numerous counts. The instant motions followed.

## II. CHRISTOPHER GRISEL

Three days after the jury's May 25, 1999 verdict, Grisel filed a motion for extension of time until June 30, 1999 to file motions

---

**3.** Prior to mid-May 1995, the cheese company was called, among other things, "Pinconning Cheese, Inc.," "Dore's Pinconning Cheese, Inc.," "Paul's Pinconning Cheese," and "Earthsafe Enterprises, Inc."

**4.** RPC was owned by Earthsafe Enterprises, Inc., an Oklahoma corporation, which in turn was jointly owned by Innoquest, Inc., a Texas corporation, of which Grisel was president, and Mikco, Inc., an Oklahoma corporation, of which Mikell was president.

**5.** Nor-Tech is located in Sioux Falls, South Dakota.

pursuant to Federal Rules of Criminal Procedure 29(c) and 34. The court granted the motion on June 4, 1999. Grisel then filed a supplemental motion to extend time until July 16, 1999 to file his post-verdict motions. The court granted this motion on July 22, 1999, two days after Grisel filed his post-verdict motions.

Federal Rule of Criminal Procedure 29(c) provides that "[i]f the jury returns a verdict of guilty ..., a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period." Rule 34 mandates an identical time frame for filing of motions.[6] Rule 45(b) provides in turn that "the court may not extend the time for taking any action under Rule 29, 33, 34 and 35, except to the extent and under the conditions stated in them."

■ On June 4, 1999, within seven days after the jury verdict,[7] the court granted Grisel's first motion for extension and directed him to file his post-verdict motions on or before June 30, 1999. Even though the court also permitted a second extension of time to file Rule 29 and 33 motions, the second motion was untimely because "Rules 29 and 33 do not allow successive extensions of time; Rule 45(b) expressly forbids them." *United States v. Hocking,*

841 F.2d 735, 737 (7th Cir.1988); *see Carlisle v. United States,* 517 U.S. 416, 420–22, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) (holding that plain and unambiguous language of Rule 29 does not permit the granting of an untimely post-verdict motion for judgment of acquittal). Thus, in hindsight, the court should not have granted Grisel's second extension motion because it lacked the authority to do so.

Some courts have held, however, that untimely motions can be acted upon when the district court induced parties to rely to their detriment on erroneous extensions of time. *See Hocking,* 841 F.2d at 737. Nevertheless, this court did not induce Grisel to rely upon the erroneous extension of time to his detriment. As stated by the Court of Appeals for the Seventh Circuit ("Seventh Circuit") in a virtually identical set of circumstances, "[a]ny error was generated by the [defense lawyer]; the district court simply granted a motion."[8] *Id.* Hence, the mere granting of an unopposed motion for extension of time does not rise to the level of inducement.

■ Even though the court lacks jurisdiction to resolve Grisel's post-verdict motions, the substance of his arguments were contained within motions that either was reserved by the court during the trial or are still pending without reservation. In-

6. Rule 34 provides, in pertinent part, that "[t]he motion in arrest of judgment shall be made within 7 days after verdict or finding of guilty ... or within such further time as the court may fix during the 7–day period."

7. Since the period allowed to file Rule 29 and 34 motions is less than eleven days, intermediate Saturdays, Sundays, and legal holidays are excluded from the computation. Fed. R.Crim.P. 45(a). Thus, excluding the intermediate weekend and Memorial Day, the court granted Grisel's motion for extension of time within the requisite seven day period.

8. In *Hocking,* the district court timely granted the defendant's first request for an extension

of time to file motions pursuant to Rule 29(c) and 33. Thereafter, the defendant asked for a second extension, which was granted by the district court. The defendant filed his motions on December 28, about 2 months after the jury verdict but within the time period established by the order granting the defendant's second extension motion. The Seventh Circuit held that these motions are not timely because (1) December 28 was not a time fixed within seven days of the jury verdict and (2) thus the defendant "had no right to ask, and the district court lacked authority to grant, a second extension." 841 F.2d at 737.

sofar as pre-verdict motions are still pending, the court has the authority to resolve those issues raised in them. With respect to motions in which a ruling has been reserved, the court is limited to the evidence presented up to the time of the reservation. Fed.R.Crim.P. 29(b). For the unreserved, pending motions, the court is not restricted by limited evidence.[9]

## III. VENUE MOTIONS [10]

Mikell asks the court to arrest judgment or to grant a judgment of acquittal as to Counts 8, 25, and 27 because the Government has failed to prove by a preponderance of evidence that venue is proper in this district. Similarly, Grisel asks the court to arrest judgment or to grant a judgment of acquittal as to Counts 9–11, 13–20, 22–24, and 29 based on the same venue argument.[11] The Government opposes these requests, arguing that venue is proper in this district because Defendants had the following ties with the Eastern District of Michigan:

1) The cheese subject to the fraud was located in Pinconning, Michigan.

2) The defendants' company, Real Pinconning Cheese, involved in the fraud was located in Pinconning, Michigan.

3) The security agreement that NFO had with RPC was filed in the Eastern District of Michigan.

4) NFO's restraining order to prevent the movement of the cheese at RPC on January 14, 1996 was located in Pinconning, Michigan.

5) The defendants conspired in Pinconning, Michigan to defraud NFO.

6) The defendants' negotiations with Mike Hines to sell the cheese at 25 cents a pound took place in Pinconning, Michigan.

7) The RPC letter confirming the 25-cent sale to Hines was typed on RPC letterhead that was located in Pinconning, Michigan.

8) Some of the parties on the January 14, 1996 conference call between NFO and the defendants were located in Pinconning, Michigan. That was the conference call in which the [d]efendants lied to NFO about the sale of the cheese.

9) The fraudulent invoices to Hines stating "price to be determined upon inspection" instead of 25 cents per pound were generated at Defendant Mikell's direction in Pinconning, Michigan and faxed from Pinconning.

10) Alan Mikell's letter of January 10, 1996, signed by Mikell and transmitted to Hines on or about that date was prepared in the Eastern District of Michigan and transmitted from here.

11) Both Mikell and Grisel, who were then in Pinconning, engaged Hines in two separate conference telephone calls during the week spanning January 10–12, 1996, in which they introduced Hines to their

---

**9.** The conclusion in this section only pertains to Grisel because Mikell filed his post-verdict motions prior to the expiration of the time period fixed by the court within seven days after the jury verdict.

**10.** The court notes that even if venue is proper for the contested counts, Defendants' convictions for these counts must still be vacated

for the reasons stated in Section IV of this order.

**11.** In his motion, Grisel asks the court for the dismissal of counts 9 to 24 and 27 to 50. Since Grisel was acquitted on numerous counts, the court will hereinafter frame Grisel's request to conform with the jury's verdict.

fraudulent scheme and enlisted his agreement to join in it.

(Gov't Resp. to Venue Mots. at 5–6.)

## A. Standard

■ Proper venue in criminal proceedings is mandated by the Constitution; Article III, § 2, cl. 3, requires that "[t]he Trials of all Crimes ... shall be held in the State where the said Crimes shall have been committed," and the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." This mandate is echoed in Federal Rule of Criminal Procedure 18, which provides, in part, that "the prosecution shall be had in a district in which the offense was committed." When multiple counts are alleged in an indictment, as in the instant case, the government must prove that venue is proper on each count by a preponderance of the evidence. *United States v. Villarini,* 238 F.3d 530, 533 (4th Cir.2001); *United States v. Corona,* 34 F.3d 876, 879 (9th Cir.1994); *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir.1989) ("[W]hen a defendant is charged in more than one count, venue must be proper with respect to each count ....").

■ Where Congress fails to explicitly define venue under a criminal statute, "the locus delicti [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales,* 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (quotation marks omitted). While some courts have looked to the verbs of the statute to determine the nature of the substantive offense, the Supreme Court recently cautioned against heavy reliance on a "verb test":

[W]e never before held, and decline to do so here, that verbs are the sole consideration in identifying the conduct that constitutes an offense. While the "verb test" certainly has value as an interpretative tool, it cannot be applied rigidly, to the exclusion of other relevant statutory language. The test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

*United States v. Rodriguez–Moreno,* 526 U.S. 275, 279–80, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). Instead, the Supreme Court has instructed courts to conduct a two-part inquiry: namely, to "initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Id.* at 279, 119 S.Ct. 1239. Thus, venue is proper only in a district in which essential conduct elements of the offense take place. *Id.* at 280, 119 S.Ct. 1239; *United States v. Bowens,* 224 F.3d 302, 311 (4th Cir.2000) ("We therefore hold that the place where a criminal offense is committed is determined solely by the essential conduct elements of that offense.").

## B. Analysis

Prior to the trial in this matter, Defendants raised identical arguments as those presented in the instant venue motions. In rejecting the earlier motions, Magistrate Judge Charles E. Binder concluded as follows:

At this stage, I am persuaded that § 3237(a) is the touchstone for determining the proper outcome of this motion....

The defendants' arguments parse the four corners of the indictment entirely too closely. The charges made in the Second Superseding Indictment are, I

suggest, precisely what is contemplated by the second paragraph of § 3237. A conspiracy with overt acts is charged. A long and complicated inter-related series of actions are then charged as being the acts which brought the conspiracy to fruition. That the individual counts are part of an underlying scheme of alleged criminal conduct and that because there is, in the words of § 3237[,] "no express provision by enactment of Congress otherwise," I therefore conclude that venue for the challenged counts is appropriate in this district.

I further conclude that the *Cabrales* case cited by counsel is distinguishable in that it effectively involved discrete offenses within different states. In this case, there is an overall conspiracy, which is alleged to have taken place in multiple states in multiple different ways, all of which the government says are charged and listed in the indictment. To summarize, since Congress has not said otherwise, I can only conclude that the conduct charged is a continuing offense and that venue is appropriate in this district.

(9/16/98 Order at 3–4.) This court overruled Defendants' objections to the magistrate judge's September 16th order, finding that such order was not clearly erroneous or contrary to law. (*See* 12/23/98 Order.)

■ The court now reconsiders its December 23, 1998 order. In the Second Superseding Indictment, both Defendants were charged with conspiracy to commit money laundering, as well as with substantive money laundering and wire and mail fraud offenses. Even if the substantive offenses were committed in furtherance of the money laundering conspiracy, this court must conduct a separate analysis for the substantive crimes and the conspiracy. *United States v. Granados*, 117 F.3d 1089, 1090 (8th Cir.1997); *Corona*, 34 F.3d at 879 ("The court must conduct a separate venue analysis for the substantive crimes and the conspiracy, even if the substantive crimes are committed in furtherance of the conspiracy."); *United States v. Walden*, 464 F.2d 1015, 1016 (4th Cir.1972).

### 1. Mail Fraud Count

The jury returned a guilty verdict on, among other things, count 11 of the Second Superseding Indictment, which charged Grisel with violating either the mail fraud statute, 18 U.S.C. § 1341,[12] or the wire fraud statute, 18 U.S.C. § 1343. Specifically, Grisel was indicted and convicted for the following overt acts:

On or about January 18, 1996, Christopher Grisel ... transmitted or caused to be transmitted via the U.S. Postal Service, and/or via facsimile transmission, a letter to Edward Buchberger, E.J. Marketing, Inc., Marathon, Wisconsin, confirming that Innoquest, Inc. was selling eighteen loads of cheese to Buchberger

---

**12.** The mail fraud statute provides in pertinent part as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or knowingly causes to be delivered by mail or such carrier according to the direction thereon, ... any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

Hence, in order to establish a mail fraud violation, the government must prove the following elements: (1) devising or intending to devise a scheme to defraud; (2) involving the use of the mails; and (3) for the purpose of executing the scheme or attempting to do so. *United States v. Crossley*, 224 F.3d 847, 857 (6th Cir.2000).

for a price approximately 2¢ per pound under the customer price obtained by Buchberger. The letter also stated that all cheese was to be moved by the end of February, 1996. By so stating, as the [D]efendant Christopher Grisel then well knew, movement of the cheese by the end of February to other purchasers and locations would render it more difficult for NFO, Inc. to trace the physical location of the cheese, thus frustrating NFO, Inc's efforts to receive fair market value therefor . . . .

(2d Superseding Indictment at 19.)

The specific venue statute regarding mail fraud is 18 U.S.C. § 3237(a), which provides that any offense involving the use of mails is a continuing offense and may be prosecuted in any district from, through, or into which such matter moves.[13] *United ed States v. Holt,* Nos. 89–6070, 89–6092, 899 F.2d 15 (Table), 1990 WL 37613, at *1– 2 (6th Cir. Apr.3, 1990). Nevertheless, § 3237 does not "allow prosecution in any place where a scheme to defraud touches, in the absence of evidence that a defendant caused a mailing . . . to be sent through or to be received in the district." *United*

*States v. Donato,* 866 F.Supp. 288, 292 (W.D.Va.1994).

■ It is undisputed that the mail matter in question did not move from, through, or into this district.[14] Nevertheless, the record is clear that the scheme to defraud, including the subject of the fraud, was partially devised and executed in this district. Thus, the primary question before the court is whether venue is appropriate for a prosecution under § 1341 in a district where the mail matter did not move from, through, or into, but where an aspect of the scheme to defraud was devised and executed. This issue is a novel one, especially in light of the Supreme Court decision in *Rodriguez–Moreno. See United States v. Brennan,* 183 F.3d 139, 145 (2d Cir.1999) ("We cannot tell whether the reasoning of *Rodriguez–Moreno* would make venue appropriate for a prosecution under § 1341 not only in districts where mail matter was sent or received in furtherance of the fraud scheme, but also in any district where any aspect of the 'scheme or artifice to defraud,' 18 U.S.C. § 1341, was practiced.")

---

**13.** At least one circuit has held that § 3237(a) does not apply to the mail fraud statute. For example, the Court of Appeals for the Second Circuit has held as follows:

[W]e agree with defendants that § 3237(a) is best read as not applying to statutes, like the mail fraud statute, that specify that a crime is committed by the particular acts of depositing and receiving mail, or causing it to be delivered, rather than the more general and ongoing act of "us[ing] the mails." Rather than make a defendant like Brennan subject to prosecution in any district through which a mail truck carrying his mail happened to drive (or perhaps even in any district over which an airplane carrying the mail happened to fly, or in which it happened to make an interim stop), we think Congress's more particularized and careful phrasing in the mail fraud statute takes it outside the scope of § 3237(a) and

is best read less expansively. We therefore hold that prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs, *i.e.,* in which the defendant "places," "deposits," "causes to be deposited," "takes," or "receives" mail or "knowingly causes" mail "to be delivered."

*United States v. Brennan,* 183 F.3d 139, 147 (2d Cir.1999). This court, however, does not need to resolve the relationship between § 1341 and § 3237. Insofar as the court concludes that venue is inappropriate in this district under the expansive version of venue (that is, § 3237), the more restrictive venue would also preclude prosecution in this district.

**14.** Even though the Second Superseding Indictment does not state the origin of the mailing/wire communication, it is undisputed that it originated in Texas.

■ As directed by the Supreme Court, in order to determine the proper venue for an offense, the court must first identify the conduct constituting the nature of the crime and then the location of the commission of the criminal acts. *Rodriguez–Moreno*, 526 U.S. at 279–80, 119 S.Ct. 1239. After reviewing the relevant authorities, the court concludes that the nature of a mail fraud offense is the misuse of mail facilities and venue is appropriate only in a district where the misuse occurred. Thus, despite the existence of some aspect of a "scheme or artifice to defraud," prosecution for the contested mail fraud offense is not appropriate here because the misuse of mail facilities occurred outside this district.

The court's conclusion is supported by three mutually enforcing reasons. First, and most importantly, it is well settled that the essence of the mail fraud statute is the use of the mails to facilitate a fraudulent scheme. *United States v. Stull*, 743 F.2d 439, 444 (6th Cir.1984) ("Use of the federal mails is not only a jurisdictional requirement, it is the gist of the crime of mail fraud."); *United States v. Aldridge*, 484 F.2d 655, 660 (7th Cir.1973) ("As to the mail fraud counts, it is settled that the gravamen of the offense is the use of the mails . . . ."); *United States v. States*, 488 F.2d 761, 767 (8th Cir.1973) ("The purpose of 18 U.S.C. § 1341 is to prevent the Postal Service from being used to carry out fraudulent schemes, regardless of what is the exact nature of the scheme and regardless of whether it happens to be forbidden by state law."); *United States v. Salsbury*, 430 F.2d 1045, 1048 (4th Cir.1970) ("The gravamen of mail fraud is the misuse of a federal instrumentality in the execution of a fraud."); *Kreuter v. United States*, 218 F.2d 532, 534 (5th Cir.1955) ("[T]he gravamen of the offense is the use of the mails"); *United States v. Hoffa*, 205 F.Supp. 710, 716 (S.D.Fla.1962) ("The gist of the offense of the crime charged in this

indictment is the use of the mails, and a scheme to defraud need not be set forth with such precision as if it were the gist of the offense.") Hence, it is the causing of the mails to be used in furtherance of the fraudulent scheme that constitutes the offense of mail fraud. While a fraudulent scheme is a component of a mail fraud charge, it is not "the nature of the crime."

■ Second, the sparse legislative history of the mail fraud statute reinforces the concept that the essential conduct element of the offense is the misuse of mail facilities, not the fraudulent activity. The Supreme Court echoed this sentiment in *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), stating that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." 323 U.S. at 95, 65 S.Ct. 148. "Congress sought to protect the integrity of the United States mails by not allowing them to be used as 'instruments of crime.'" *McNally v. United States*, 483 U.S. 350, 365, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting) (citing *United States v. Brewer*, 528 F.2d 492, 498 (4th Cir.1975)). Hence, the purpose of the mail fraud legislation is to protect the postal agency, not to prevent frauds in general, a task within the province of state law:

The focus of the statute is upon the misuse of the Postal Service, not the regulation of state affairs, and Congress clearly has the authority to regulate such misuse of the mails. *See Badders v. United States*, 240 U.S. 391, 393[, 36 S.Ct. 367, 60 L.Ed. 706] (1916): "The overt act of putting a letter into the postoffice of the United States is a matter that Congress may regulate. * * * Whatever the limits to its power, it may

forbid any such acts done in furtherance of a scheme it regards as contrary to public policy, whether it can forbid the scheme or not." The purpose of 18 U.S.C. § 1341 is to prevent the Postal Service from being used to carry out fraudulent schemes, regardless of what is the exact nature of the scheme and regardless of whether it happens to be forbidden by state law. *See Parr v. United States,* 363 U.S. 370, 389, 390[, 80 S.Ct. 1171, 4 L.Ed.2d 1277] (1960); *cf. Brady v. United States,* 24 F.2d 405, 407 (8th Cir.1928). "Congress definitely intends that the misuse of the mails shall be controlled even though it be its policy to leave the control of elections to the several States." *United States v. Classic,* 35 F.Supp. 457, 458 (D.C.La.1940). *States,* 488 F.2d at 767.

Finally, the importance of a fraudulent scheme is further undermined by three related areas of case law. First, one well-established line of cases demonstrate that the success of the scheme is not essential to the crime. *See Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) ("The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud."); *United States v. Martin,* 228 F.3d 1, 16 (1st Cir.2000); *United States v. Pierce,* 224 F.3d 158, 166 (2d Cir.2000); *United States v. Bach,* 172 F.3d 520, 522 (7th Cir.1999) ("It is irrelevant that the mailings failed in their purpose; a scheme to defraud need not succeed to violate the mail fraud statute."); *Kreuter v. United States,* 218 F.2d 532, 535 (5th Cir.1955) ("Success of the scheme is not essential to completion of the offense and it is not necessary to prove communication of the alleged false representations

to the victims.") This underscores the point that the misuse of the mail, and not the fraudulent scheme, is the conduct constituting the offense.

A second area of analysis conclude that the statute of limitations begins to run from the completion of the mailing, not the completion of the scheme. *See United States v. Crossley,* 224 F.3d 847, 859 (6th Cir.2000) ("[T]he offense of mail fraud is completed and the statute of limitations begins to run on the date on which the defendant, depending on the specific use of the mails charged in the indictment, places, deposits, causes to be deposited, takes, or receives mail, or knowingly causes mail to be delivered as part of the execution of a scheme to defraud" (internal quotation marks omitted).); *United States v. Eckhardt,* 843 F.2d 989, 993 (7th Cir. 1988) ("[I]t is well-settled that the statute of limitations for … mail fraud does not begin running with the completion of the fraud scheme; rather, it runs from the date of the charged call or mailing in furtherance of the scheme. It is irrelevant when the fraud scheme itself ended, so long as the charged call or mailing took place within the statutory period" (internal citations omitted).) It is well-settled law that the statute of limitations begins to run when each element of the crime has occurred and the crime is complete. *Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970); *Crossley,* 224 F.3d at 859; *United States v. Lutz,* 154 F.3d 581, 586 (6th Cir.1998). Insofar as the Court of Appeals for the Sixth Circuit ("Sixth Circuit"), as well as other circuits, has deemed that the elements of a mail fraud crime have occurred upon the completion of the mailing, despite the continuation of the fraudulent scheme, it is difficult to contend that the fraudulent scheme is the essence, or part of the essence, of a mail fraud crime.

Finally, it is well-settled that multiple mail fraud convictions can stem from the same fraudulent scheme without offending the constitutional prohibition against double jeopardy. *See Badders,* 240 U.S. at 394, 36 S.Ct. 367 ("[T]here is no doubt that the law may make each putting of a letter into the postoffice a separate offense."); *United States v. Gardner,* 65 F.3d 82, 85 (8th Cir.1995); *United States v. Johnson,* 612 F.2d 843, 845–46 (4th Cir.1979). The courts have reasoned that, under the mail fraud statute, "it is not the plan or scheme that is punished, but rather each individual use of the mails in furtherance of that scheme." *Gardner,* 65 F.3d at 85. Moreover, when Congress proscribes distinct acts, then separate prosecutions are permissible even if the acts were committed in furtherance of the same criminal enterprise. *Id.; Johnson,* 612 F.2d at 846. Thus, the separate instances of mailings, the individual acts targeted by the mail fraud statute, can be prosecuted separately despite the presence of a single fraudulent scheme. *Gardner,* 65 F.3d at 85. Once again, this treatment of the mail fraud statute illustrates that the fraudulent scheme is not "the nature of [the mail fraud] crime."

Other courts have held similarly. In *United States v. Donato,* 866 F.Supp. 288 (W.D.Va.1994), the district court dismissed two counts of mail and wire fraud for failure by the government to allege facts showing that the Western District of Virginia was the proper venue for the prosecution of those actions. The *Donato* court held that "venue under the mail and wire fraud statutes lies at the place where an individual causes a mailing or wire communication to be sent or received." *Donato,* 866 F.Supp. at 292. It reasoned in pertinent part as follows:

> Though mail and wire fraud are continuing offenses, venue is not as expansive as the Government argues. Section 3237(a) does not allow prosecution in any place where a scheme to defraud touches, in the absence of evidence that a defendant caused a mailing or interstate wire communication to be sent through or to be received in the district. The mail and wire fraud statutes punish the use of the mails or wires in pursuit of a scheme to defraud; fraudulent activity cannot form the basis for venue unless it is related to these offenses. *See* §§ 1341, 1343. Under the rule established by *Kreuter v. United States,* 218 F.2d 532 (5th Cir.), cert. denied, 349 U.S. 932[, 75 S.Ct. 777, 99 L.Ed. 1262] (1955) and *United States v. Hoffa,* 205 F.Supp. 710 (S.D.Fla.), cert. denied, 371 U.S. 892[, 83 S.Ct. 188, 9 L.Ed.2d 125] (1962), venue in mail fraud actions is not proper in the district where a scheme to defraud is hatched absent evidence establishing that a defendant sent, received, or caused the sending or receiving of mail matter in the district. By analogy, the same rule applies to wire fraud prosecutions. This rule prevents establishing venue on the basis of a defendant's activities or presence in a district where such activities or presence are unrelated to any act punishable under § 1341 or § 1343. The federal venue statute does not override the definition of the offenses in the mail or wire fraud statutes, to which this court must look when determining venue under the principles of *Walden;* it simply allows the prosecution of such offenses to be maintained wherever the mails or wires have been used in the course of a scheme to defraud.

*Donato,* 866 F.Supp. at 292–93. The *Donato* court relied upon the rule established in *Kreuter v. United States,* 218 F.2d 532 (5th Cir.1955) and *United States v. Hoffa,* 205 F.Supp. 710 (S.D.Fla.1962). Specifically, these courts held that "[i]t has been

well settled that, in a prosecution for mail fraud, the offense is committed and trial may be had only in the place of mailing or the place of receipt of the mail or in the place through which the mail has passed." *Hoffa,* 205 F.Supp. at 722. Thus, "[t]he place where the scheme is conceived or put in motion is totally immaterial and cannot serve as venue in prosecution for mail fraud." *Id.; accord Kreuter,* 218 F.2d at 534; *Baker v. United States,* 115 F.2d 533, 537 (8th Cir.1940).[15] While these decisions were rendered pre-*Rodriguez-Moreno,* the court finds that the reasoning still holds true.

In the instant matter, there is no allegation that the mailings touched this district.[16] In its response to the venue motions, the Government highlights Defendants' numerous ties with this district. Those ties, however, pertain to the fraudulent scheme, not the charged misuse of the mail.

The Government incorrectly relies on the "overall conspiracy which is alleged to have taken place in multiple states in multiple different ways" and the fact that mail fraud is a continuing offense. (Venue Mots. at 4.) As discussed earlier, the continuing offense statute, § 3237, does not permit prosecution in any place where the scheme touches; instead, it requires prosecution where the charged mailing initiated, passed through, or was completed. *Donato,* 866 F.Supp. at 292. Moreover, the overall conspiracy is irrelevant in the court's determination of proper venue. Even if the mail fraud offense were committed in furtherance of the overall con-

spiracy, the court must conduct a separate venue analysis for each charged offense. *Granados,* 117 F.3d at 1090; *Corona,* 34 F.3d at 879; *Walden,* 464 F.2d at 1016. To hold otherwise would afford the government unfair advantage over the defendants. *See Walden,* 464 F.2d at 1020 ("A decision by the United States to prosecute for conspiracy is not without some advantages to the government. To add to the advantages already existing by engrafting a forum shopping option as to the substantive offenses would ... go too far. To repeat, venue is not mere formalism. The right to a trial before a jury of the vicinage is fundamental and such a trial ought to be held at the place of commission of the substantive offense. The Sixth Amendment may not be ignored ....")

■ Though not directly articulated by the Government, there is a question of whether venue is proper based on the substantial contacts that Defendants had with this district and the effects of such contacts felt by this district. This court has been able to discover only one scenario in which a defendant's "substantial contacts" are considered for venue purposes. In *United States v. Reed,* 773 F.2d 477 (2d Cir.1985), the Court of Appeals for the Second Circuit ("Second Circuit") created the substantial contacts test, holding that

> a review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of

---

**15.** "The use of the Post Office Department in the execution of the alleged scheme to defraud or obtain money by false pretenses is the gist of the offense, which the statute denounces. The devising of a scheme to obtain money by means of fraud or false pretenses is not a crime under the laws of the United States. It becomes a crime only in the event

the United States mails are used in carrying out the scheme." *Baker,* 115 F.2d at 537.

**16.** The Government does not contest this conclusion. (*See* Gov't 5/14/99 Resp. at 9 ("The indictment does not allege that any of the mailings ... in [Count 11] touch Michigan.").)

factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding . . . .

773 F.2d at 481. This test has been adopted by the Sixth Circuit. *See United States v. Williams,* 788 F.2d 1213, 1215 (6th Cir.1986).

■ Nevertheless, the substantial contacts test does not apply to the instant action:

> The framework arising out from *[United States v.] Beddow* [957 F.2d 1330 (6th Cir.1992)] . . . is to first determine on a count-by-count basis if each count in the indictment is one that is a continuous crime. If it is, then venue is proper for that count in any district where the crime alleged therein began, continued, or ended. 18 U.S.C. § 3237(a). In deciding which district should try the case, a court should next apply the *[Reed]* factors[.]

*United States v. Hunter,* 863 F.Supp. 462, 471 (E.D.Mich.1994); *see United States v. Saavedra,* 223 F.3d 85 (2d Cir.2000) (applying a two part inquiry in which the court must determine whether the offense in question is a continuing offense and then analyze whether the criminal activities bear substantial contacts with the district). As recently stated by the Second Circuit, the substantial contacts test "offers guideline on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial." *Saavedra,* 223 F.3d at 93. The test thus defines "[t]he outer limits on how broadly

Congress may define a continuing offense and thereby create multiple venue." *Id.* at 92–93.[17]

Hence, the substantial contacts test becomes relevant only if the continuing offense began, continued, or ended in this district. For the reasons already set forth, this court has already determined that mail fraud crime began, continued, and ended outside this district. Hence, it is unnecessary to evaluate whether Defendants' criminal activities bear sufficiently substantial contacts with this district as to pass Constitutional muster.

Moreover, with respect to statutes for which Congress has not defined the conduct elements in terms of effects, the courts have never held that venue may be based on the effects of criminal conduct alone. *See Rodriguez–Moreno,* 526 U.S. at 279 n. 2, 119 S.Ct. 1239 ("The Government argues that venue also may permissibly be based upon the effects of a defendant's conduct in a district court other than the one in which the defendant performs the acts constituting the offense. Because this case only concerns the locus delicti, we express no opinion as to whether the Government's assertion is correct" (citation omitted).)

Thus, although venue may lie "where the effects of the defendant's conduct are felt," this is true "only when Congress has defined the essential conduct elements in terms of those effects." *Bowens,* 224 F.3d at 314. Here, there is no evidence that Congress has defined—or that the courts have interpreted—mail fraud crimes to extend to districts where the fraudulent scheme, but not the misuse of the mails, occurred. If Congress intended to create

---

**17.** "Notwithstanding Congress'[s] power to define continuing offenses having the potential for multiple venues, the Supreme Court has repeatedly recognized that a cautious interpretive approach is 'more consonant with the considerations of historic experience and policy which underlie [the venue] safeguards in the Constitution.'" *Saavedra,* 223 F.3d at 92 (citing *United States v. Johnson,* 323 U.S. 273, 275, 65 S.Ct. 249, 89 L.Ed. 236 (1944)).

such a venue provision for this type of crime, it could have chosen to do so. As cited by the *Reed* court, some examples of venue provisions based solely on the effects of the offense can be found in the Hobbs and the Taft–Hartley Acts, bail jumping statutes, and in statutes addressing the inducement of the unlawful entry of immigrants. *Reed*, 773 F.2d at 482. No such provision exists for mail fraud offenses.

Accordingly, the mail fraud aspect of Count 11 must be dismissed for improper venue.[18] The mail fraud statute criminalizes the misuse of the mails, and not the fraudulent scheme that such misuse facilitated. Since the misuse of the mails occurred outside this district, Grisel's conviction must be arrested pursuant to Rule 34.

### 2. Wire Fraud Counts

Title 18 of the United States Code, section 1343, provides in relevant part as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

Thus, to establish a defendant's liability under § 1343, the Government must establish three elements: namely, (1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property. 18 U.S.C. § 1343; *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir.2000). As with a mail fraud offense, a wire fraud crime is a continuing offense subject to the venue provisions of § 3237(a), which provides in relevant part that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted

---

**18.** *Contra* 2 Charles Alan Wright, *Federal Practice and Procedure* § 303 (3d ed. 2000) ("Although it is commonly said that mail-fraud cases may be prosecuted in the district of mailing or receipt or, since 1948, districts through which the mail has moved, and may not be prosecuted elsewhere, it can be fairly argued that the place where the scheme to use the mails to defraud was devised is also a proper venue" (internal footnotes omitted).) The cases cited by Mr. Wright, however, do not support his assertion. In fact, one of the cited cases held to the contrary. In *United States v. Cashin*, 281 F.2d 669, 674 (2d Cir. 1960), the court stated in relevant part as follows:

It has long been settled that in prosecution for mail fraud trial may be had only in the place of mailing, the place of receipt of the mail, and places through which the mailed matter passed.... [T]he purpose of the mail fraud statute is to protect against the "use of the United States mails in furtherance of ... (the) scheme," while the evil at which the Securities Act is directed is the fraud in the sale of securities. It is entirely reasonable that under each statute trial should be had at the place where the primary evils at which the law is directed occur. Moreover, we cannot ignore the fact that the venue rule for mail fraud cases was developed many decades ago, when more restricted notions of limits of federal power prevailed than exist today. Were the issue of appropriate place of trial in such cases to arise *de novo* in 1960, it is by no means clear that trial would not be permitted at the place where the fraudulent scheme was developed as well as at the places where the mailing has its impact.

Nevertheless, even though the *Cashin* court did not extend the restricting rule to securities cases, it found "no compelling reason to change the already settled doctrine for mail fraud cases." *Id.*

in any district in which such offense was begun, continued, or completed."

There is no dispute that the wire communications at issue were sent, passed through, and received outside this district. Specifically, Defendants were convicted, *inter alia,* on counts relating to the following wire communications:

(1) between Oklahoma and Ohio (count 8);

(2) between Ohio and either Texas or South Dakota (count 9);

(3) between Texas and Wisconsin (count 10);

(4) between Texas and Wisconsin (count 11);[19]

(5) between Texas and South Dakota (count 13);

(6) between Texas and California (count 14);

(7) between Texas and either Ohio or Michigan[20] (count 22);

(8) between Texas and South Dakota (count 23);

(9) between Texas and Wisconsin (count 24); and

(10) between Ohio to Oklahoma (count 25).

Once again, the court is confronted with a situation where the actual communications were committed outside this district, but the fraudulent scheme was partially devised and executed in this district. Hence, the court must determine whether venue is appropriate for a prosecution under § 1343 in a district in which the wire communications were neither dispatched, sent through, nor received, but where an aspect of the scheme to defraud was devised and executed.

After reviewing pertinent authorities, the court must conclude that, despite the presence of a fraudulent scheme, prosecution for the contested wire fraud offenses is not appropriate in this district. This conclusion is deduced from the case law regarding mail fraud. Since mail and wire fraud statutes share similar statutory language, courts have applied the same substantive analysis to these statutes. *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."); *United States v. Thorpe,* 166 F.3d 1216 (Table), 1998 WL 738624, at *6 (6th Cir. Oct.15, 1998) ("Although *Belt [v. United States,* 868 F.2d 1208 (11th Cir.1989)] was a wire fraud case, its analysis is applicable to mail fraud statute under § 1341. This is because the wire fraud statute (§ 1343) and the mail fraud statute (§ 1341) are, according to the Supreme Court, to be given a similar construction and are subject to the same substantive analysis."). Thus, for the reasons stated in section II(B)(1) and in light of the fact that "[t]he gravamen of [a wire fraud] offense is simply the misuse of interstate communication facilities to execute any scheme or artifice to defraud," *United States v. Condolon,* 600 F.2d 7, 8 (4th Cir.1979), the court finds that the misuse of the wire facilities is the essential conduct element of a wire fraud crime. While the Government must prove the existence of a "scheme or artifice to defraud"

19. The mail fraud aspect of this count was discussed in a prior section of this order.

20. It is the Government's burden to establish proper venue by a preponderance of the evidence. Insofar as the only evidence presented indicated that Dennis Tonak did not know where he was when he spoke by telephone with Defendant Grisel, who was in Texas at that time, the court must assume, for purposes of this count, that the Michigan connection has not been established.

to establish liability under the wire fraud statute, the fraudulent activity alone cannot form the basis for venue.

Insofar as none of the wire communications in the challenged counts touched this district, the court must arrest judgment of these counts for improper venue pursuant to Rule 34.

### 3. Money Laundering Counts

In Count 27 of the Second Superseding Indictment, Mikell is charged with money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2. Specifically, the indictment provides that Mikell committed the following overt acts:

On or about February 20, 1996, after repeatedly misleading representatives of NFO, Inc. and others as to the price that had been obtained for the cheese, and having taken steps to move the cheese and hide proceeds derived therefrom in order to frustrate efforts to determine the true price that had been obtained, Mikell, Christopher Grisel, and Hines, tendered and caused to be tendered to Concord Growth on behalf of NFO, Inc., a wire transfer in purported payment for the cheese of approximately $186,670.91 . . . .

(2d Superseding Indictment at 32–33.)

Grisel was similarly charged with money laundering in Counts 15–20 and 29 of the indictment. In particular, in Counts 15–20, the indictment asserts that Grisel committed the following overt acts:

Following his (Hines's) receipt from E.J. Marketing, Inc. (Edward Buchberger) of the proceeds from cheese sold by Innoquest, Inc. to E.J. Marketing, and at the request of Christopher Grisel, Hines wire transferred or caused to be wire transferred, from Nor–Tech, Inc., to Innoquest, Inc., a total of approximately $565,000. The aforesaid wire transfers were made on or about the individual dates set forth below:

| Count | Date of Wire Transfer | Amount of Wire Transfer | Description |
|---|---|---|---|
| 15 | 01/16/96 | $ 50,000.00 | From Nor–Tech to Innoquest |
| 16 | 01/19/96 | $ 25,000.00 | From Nor–Tech to Innoquest |
| 17 | 01/25/96 | $ 90,000.00 | From Nor–Tech to Innoquest |
| 18 | 02/02/96 | $150,000.00 | From Nor–Tech to Innoquest |
| 19 | 02/09/96 | $100,000.00 | From Nor–Tech to Innoquest |
| 20 | 02/22/96 | $150,000.00 | From Nor–Tech to Innoquest |

(2d Superseding Indictment at 23–24.) In Count 29, the indictment charges Grisel with the following acts on or about May 5, 1996:

B. Two of the loads of cheese initially sold to Nor–Tech, Inc. (Hines) to Sorrento Cheese Company (Sorrento) were rejected by Sorrento because of the quality standards and specific tolerances for cheeses required by Sorrento. These two

loads were returned to RPC by Sorrento.

C. Subsequently, these two loads of cheese were sold by RPC (Mikell) to Nor–Tech, Inc. (Hines) for approximately 25¢ per pound. This cheese was then re-sold by Nor–Tech, Inc. to MCT Dairies, Inc., Maplewood, New Jersey, for approximately $1.00 per pound, generating sale proceeds of approximately $83,420.18. Nor–Tech, Inc. (Hines) retained $66,752.99. The balance of approximately $16,667.19 was remitted by Nor–Tech, Inc. to Innoquest, Inc. (Christopher Grisel).

(*Id.* at 35.)

The money laundering statute, 18 U.S.C. § 1956, provides, in relevant part, that

[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity ... shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i). Hence, the elements of this offense are:

(1) the use of funds that are proceeds of unlawful activity;

(2) knowledge that the funds are proceeds of unlawful activity; and

(3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds.

*United States v. Prince*, 214 F.3d 740, 747 (6th Cir.2000).

Defendants ask the court to reach the same conclusion as the Supreme Court in *United States v. Cabrales*, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998). In *Cabrales*, the defendant deposited $40,000 with the AmSouth Bank of Florida and, within a week's period, made four separate withdrawals of $9,500 each from the bank. The money at issue was traceable to the illegal sale of cocaine in Missouri. Thus, the money laundering occurred wholly in Florida but the money was derived from unlawful activities in Missouri. The Supreme Court held that Missouri was not a proper venue for the trial of the money-laundering offenses at issue, stating, *inter alia,* that the money laundering statute "interdict[s] only the financial transactions ..., not the anterior criminal conduct that yielded the funds allegedly laundered." *Cabrales,* 524 U.S. at 7, 118 S.Ct. 1772.

It is undisputed the wire transfers at issue were from South Dakota to Texas (Counts 15–20, 29) and to California (Count 27). Thus, these financial transactions occurred outside this district. Nevertheless, the Government asserts that venue for these counts is proper because

[t]his case is ... a continuing offense and can be brought pursuant to 18 U.S.C. § 3237(a), which states that a continued offense begun in one district and completed in another may be prosecuted in any district in which such offense was begun, continued or completed. This case was a continuing offense in which all the actions are interwoven. First, Mikell and Grisel make a plan to sell the cheese back to themselves through the help of Michael Hines. They then deceive NFO about the sale in order to give themselves enough time

to consummate the sale and launder the proceeds through Hines'[s] company back to themselves and NFO. An essential part of the elaborate deception set forth in the overt acts took place in Pinconning, Michigan, when at Mikell's direction Gwizdala faxed false and misleading invoices to NFO stating that the price would be determined upon inspection.

(Gov't 5/14/99 Resp. at 6.[21])

■ The Government's assertion is only partially correct. The *Cabrales* court recognized that "[m]oney laundering ... arguably might rank as a 'continuing offense,' triable in more than one place, if the launderer acquired the funds in one district and transported them into another." 524 U.S. at 8, 118 S.Ct. 1772 (citation omitted). Nevertheless, money laundering crimes are not continuing offenses simply because "all the actions are interwoven," as asserted by the Government. Instead, they are continuing offenses, if at all, because the financial transactions (1) were begun in one district and completed in another or (2) committed in more than one district. 18 U.S.C. § 3237.

Despite the Government's assertions to the contrary, the anterior criminal activities in themselves, even for continuing offenses, are not relevant. As interpreted by the Supreme Court, the money laundering statute does not proscribe "the anterior criminal conduct that yielded the funds allegedly laundered." *Rodriguez–Moreno*, 526 U.S. at 280 n. 4, 119 S.Ct. 1239 (citing *Cabrales*, 524 U.S. at 7, 118 S.Ct. 1772). The Supreme Court reasoned that the existence of criminally generated proceeds was a "circumstance element" of the of-

fense, not the essential conduct element as required for venue analysis. *Id.*

■ The question before the court then is whether *Cabrales* is distinguishable from the instant circumstances because Defendants, unlike the defendant in *Cabrales*, are also charged with the anterior criminal conduct. In *United States v. Villarini*, 238 F.3d 530 (4th Cir.2001), the defendant—like Defendants in this action—was charged with money laundering offenses in the district where the anterior conduct occurred. There, the defendant Karen Villarini had embezzled money from the Bank of Floyd in Roanoke, Virginia, where she was employed as the head teller. Thereafter, she resigned from her employment and moved to Florida, where she committed four financial transactions that were the bases of the money laundering counts. The Court of Appeals for the Eleventh Circuit rejected the government's contention that venue was proper in the Western District of Virginia, concluding that "both *Cabrales* and *Rodriguez–Moreno* clearly establish that the mere fact that proceeds were criminally generated in a particular district is not sufficient, standing alone, to establish proper venue in that district for a charge of laundering the money." *Villarini*, 238 F.3d at 535.

This court agrees. It is clearly established that venue must be proper as to each count. Thus, in order to satisfy its burden of establishing venue by a preponderance of the evidence, the Government is not permitted to piggyback the faulty venue of the money laundering counts by latching them onto the wire fraud counts that are properly before the court.[22] As

---

21. In response to the instant venue motions, the Government incorporated the arguments set forth in the May 14, 1999 brief.

22. The specified unlawful activities of the instant money laundering crimes also include mail fraud offenses. Insofar as the court has concluded that this district was not the proper venue to try Grisel's sole mail fraud conviction, the mail fraud offense is not included in this aspect of the analysis.

with the mail and wire fraud counts, the court must "initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *Rodriguez–Moreno,* 526 U.S. at 279, 119 S.Ct. 1239.

It is well-established that the nature of the money laundering crime is the financial transaction, not the anterior criminal conduct. *Cabrales,* 524 U.S. at 7, 118 S.Ct. 1772. The existence of the anterior criminal activity is only a "circumstance element" of the money laundering, *Rodriguez–Moreno,* 526 U.S. at 280 n. 4, 119 S.Ct. 1239, not one of the essential conduct elements of the offense. Hence, the court concludes that the existence of the anterior criminal activities in this district is not sufficient, in itself, to warrant a finding of proper venue.

While this court is confident in its conclusion, it will note that a panel of the Sixth Circuit has implied otherwise, *in dicta,* in an unpublished decision. In *United States v. Aronds,* 210 F.3d 373 (Table), 2000 WL 303003 (6th Cir. Mar.14, 2000), the court found that "*Cabrales* does not decide the appropriate venue when the defendant is charged with both money laundering and with the underlying crime." 2000 WL 303003, at *11. The court stated that *Cabrales* is distinguishable to the extent that Aronds, the defendant in the matter, was also charged with the anterior criminal acts that yields the funds allegedly laundered. *Id.* The court did not expand on this concept, however, because the defendant waived the issue by failing to raise it in the district court. Notwithstanding, the court expressed its concerns about the effects of a successful venue challenge:

a venue challenge would have meant that, if successful, [d]efendant would have been required to defend himself in two trials in two different states—one for his underlying crimes and the other for the laundering of the proceeds of those crimes. Not only would this have caused additional expense and inconvenience to Aronds, but it would have wasted resources of two branches of the United States government.

*Aronds,* 2000 WL 303003, at *12.

While these fiscal concerns are certainly legitimate, they cannot override a defendant's Constitutional rights. The Constitution clearly mandates that "[t]he Trials of all Crimes ... shall be held in the State where the said Crimes shall have been committed" U.S. Const. art. III, § 2, cl. 3; *see also* U.S. Const. amend. VI. Moreover, the Supreme Court has repeatedly articulated a rule favoring restrictive construction of venue provisions. *See Travis v. United States,* 364 U.S. 631, 634, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961) ("[V]enue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of a tribunal favorable to it" (internal quotation marks omitted).); *United States v. Cores,* 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944)[23] ("If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it.").

Thus, the court finds that efficiency concerns, while legitimate, cannot take precedence over a defendant's right to proper venue. A defendant may, if desired, waive

---

**23.** Even though Congress passed § 3237 in response to the *Johnson* decision, the general validity of the stated rule of construction is not affected. *See Brennan,* 183 F.3d at 147.

his right to proper venue in order to economize his resources. The government may not, however, preclude defendant from enforcing his right to demand a trial in the proper district.[24]

It appears that the Sixth Circuit may have relied on the Supreme Court's decision in *United States v. Lombardo,* 241 U.S. 73, 36 S.Ct. 508, 60 L.Ed. 897 (1916), in formulating the *dicta* set forth in *Aronds.* The *Lombardo* Court stated, among other things, that "where a crime consists of a distinct part which has different localities the whole may be tried where any part can be proved to have been done." 241 U.S. at 77, 36 S.Ct. 508. The *Rodriguez–Moreno* court found this statement to be significant in its conclusion that venue is proper for a violation of 18 U.S.C. § 924(c)(1) in any district where the crime of violence was committed. This statement is inapplicable for resolving the instant issue, however, because the anterior criminal conduct is not a distinct part of the money laundering offenses; the money laundering statutes do not proscribe such conduct.

This court is aware that the facts of the *Cabrales* decision are distinguishable in many aspects from those in the instant action. For example, unlike Defendants, Cabrales were charged with a criminal activity (that is, money laundering) that took place after the anterior criminal conduct was begun and completed by others. Moreover, the funds laundered by Cabrales were not transported to another district; instead, all of the financial transactions occurred in Florida. Cabrales was not charged with a conspiracy count, while Defendants were charged with a conspiracy to violate the money laundering statute, in violation of 18 U.S.C. § 1956(h). Finally, Cabrales was charged with subsection (a)(1)(B)(ii) of § 1956, whereas Defendants were charged with subsection (a)(1)(A)(i).

Nevertheless, these distinctions are not significant because they do not detract from the principal lessons of the *Cabrales* decision. The *Cabrales* Court clearly defined the nature of a money laundering offense as one that "interdict[s] only the financial transactions ..., not the anterior criminal conduct that yielded the funds allegedly laundered." *Id.* at 7, 118 S.Ct. 1772. Thus, insofar as the financial transactions in question occurred outside the Eastern District of Michigan, venue is not proper here. The fact that the anterior criminal conduct of Defendants, as well as the conspiracy to commit the criminal activity, occurred in this district is of no moment. As stated in earlier sections, the government must prove that venue is proper on each count by a preponderance of the evidence, *Villarini,* 238 F.3d at 533; *Corona,* 34 F.3d at 879; *Beech–Nut Nutrition,* 871 F.2d at 1188, and even if the substantive offenses were committed in furtherance of the money laundering conspiracy, this court must conduct a separate analysis for the substantive crimes and the conspiracy, *Granados,* 117 F.3d at 1090; *Corona,* 34 F.3d at 879; *Walden,* 464 F.2d at 1016. Morever, even if the money laundering offenses in question are continuing offense under § 3237, Defendant did not begin, continue, or complete the financial transactions in question (that is, the money laundering offenses) in this district.

Accordingly, Defendants' convictions on Counts 15 to 20, 27, and 29 must be arrested for improper venue pursuant to Rule 34.

## IV. MATERIALITY MOTIONS

Defendants next argue that Counts 1

---

**24.** As discussed earlier, Congress may define a crime in terms of its effects, which may promote the efficiency concerns stated by the *Aronds* court.

through 7[25] should be vacated because, irrespective of whether there is any evidence of deceptive conduct or scheme, there is insufficient evidence of fraud if the alleged object of the scheme is not the money or property of the alleged victim.[26] The Government disagrees, asking the court to deny this set of motions.

■ Even though Defendants present numerous grounds in support of this set of motions, the only meritorious argument concerns NFO's perfection of its secured interest in the collateral at issue. More specifically, Defendants argue that the Government averred consistently throughout this action that Dore's Pinconning Cheese, Inc., Paul's Pinconnning Cheese, Inc., Earthsafe Enterprises, Inc., and Real Pinconning Cheese L.C. all constituted a single and continuous enterprise, the same cheese plant, under the continuous control of Defendants. Following the Government's theory, Defendants assert that the cheese plant granted security interests in RPC's inventory and accounts receivable to creditors other than NFO, including Dore & Associates Contracting ("Dore") and Earthsafe Enterprises, Inc. ("Earthsafe").[27] While all of the secured creditors filed UCC financing statements of public record, Dore was the first to file the statement, followed by Earthsafe, NFO, and then Concord Growth. Since Dore and Earthsafe were owed a secured debt in an amount greater than the collateral at issue,

Defendants argue that NFO's security interest does not have any value.

■ In resolving post-verdict motions, a court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Young,* 208 F.3d 216 (Table), 2000 WL 222590, at *2 (6th Cir. Feb.15, 2000) (citation omitted). After reviewing the evidence from the appropriate perspective, the court finds that no rational trier of fact could have found the essential elements of the charged counts beyond a reasonable doubt; thus, Defendants are entitled to a judgment of acquittal as a matter of law.

■ Both mail and wire fraud crimes require a "scheme or artifice to defraud."[28] 18 U.S.C. §§ 1341, 1343. "[T]he words 'to defraud' commonly refer 'to wrongdoing one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally,* 483 U.S. at 358, 107 S.Ct. 2875 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)). "A scheme to deceive, however dishonest the method employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *United*

---

**25.** Count One charges Defendants with conspiracy to commit money laundering, while the remaining counts charge Defendants with wire fraud offenses.

**26.** In addition to Counts 1 through 7, Defendants assert that Counts 8–11, 13–20, 22–25, 27, and 29 should also be vacated. In light of the court's resolution of the venue motions, only Counts 1 to 7 remain pertinent for purposes of this set of motions. If the court had jurisdiction over the other counts of the Second Superseding Indictment, however, those

counts must be dismissed for the reasons stated here.

**27.** Earthsafe later assigned its security interest to the DPC Buy-out Group.

**28.** Insofar as the courts have applied the same substantive analysis to mail fraud and wire fraud statutes, this court will hereinafter use the terms "mail fraud" and "wire fraud" interchangeably.

*States v. Pierce,* 224 F.3d 158, 165 (2d Cir.2000) (citing *Carpenter v. United States,* 484 U.S. 19, 27–28, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)).

 A security interest is a property right, and the taking of a security interest by fraud will support a conviction under the mail fraud statute provided that other statutory elements are met. *Ward v. United States,* 845 F.2d 1459, 1462 (7th Cir.1988). It is undisputed that NFO and RPC entered into a "Collateral Pledge and Security Agreement" ("Agreement"), which gave NFO a security interest in "[a]ll of [RPC]'s right, title and interest in and to inventory cheese products and goods, whether manufactured or produced by [RPC] or on behalf of [RPC] or obtained otherwise by [RPC], including all warehouse inventory thereof wherever located." (Security Agreement at 2.) The only crucial issue thus is whether NFO's "security interest" had any value during the relevant times of the fraud in question.

Throughout the trial, the Government averred that the cheese plant, despite its numerous names, was a single business entity from 1994 to 1996. Whether this averment is necessarily true is irrelevant; the court must look at the evidence in the light that is most favorable to the Government and accept the Government's reasonable presentation of the facts. Thus, following the Government's contention, the court finds that two creditors, Dore and Earthsafe, secured their rights before NFO.[29]

As explained by the court during its jury instructions:

If any other creditor like Earthsafe also obtained a security interest in the cheese inventory and accounts receivable, then the creditor who filed its mortgage first, was entitled to take the receivables and cheese inventory and apply that property to its debt until the debt was paid in full.

(Jury Instructions at 30–31.) The evidence reveals that Dore was owed a secured debt worth over $3 million and that Earthsafe was owed a secured debt worth at least $850,000. Considering the evidence that the cheese cost, at most, $1.40 per pound, the 771,338.9 pounds of cheese at issue was worth approximately only $1 million. Thus, NFO's security interest had no value because the combination of Dore's and Earthsafe's accounts exceeded the market value of the cheese at issue.[30]

In its response, the Government points to numerous incidents of suspicious behavior. For example, the Government rhetorically asks, "If there was *no* security interest, or only a worthless one, then why did Mikell pay NFO (through Concord) anything?"[31] (Gov't Resp. to Materiality Mots. at 12 (emphasis in original).) Moreover, the Government queries why Defendants "made extensive efforts to prevent NFO from receiving the *total* cheese proceeds if NFO had no legal right to any of those same proceeds." (*Id.*)

Most would agree that behavior such as that noted by the Government seems indicative of an intent to deprive NFO of the cheese proceeds. The course of action taken by Defendants appears less than ethical, to say the least. Nevertheless,

---

29. Dore has a security interest in Pinconning Cheese, Inc., and Earthsafe has a security interest in Dore's Pnconning Cheese, Inc.

30. That Defendants chose to pay NFO ahead of the other two secured creditors does not elevate the status of NFO's account.

31. NFO received proceeds from the sale of the cheese in the amount $186,670.91 in February 1996.

even if these business practices are unsavory, this alone, even with strong evidence of criminal intent, cannot constitute a "scheme to defraud" under the mail and wire fraud statutes in the absence of a property right for the scheme to interfere with. *Pierce*, 224 F.3d at 165.

Since NFO was not deprived of anything in which it had a property right, Defendants did not violate § 1343 and thus are entitled to a judgment of acquittal as to Counts 2–7. Additionally, Defendants are entitled to a judgment of acquittal as to Count 1 because the conviction for conspiracy to commit money laundering cannot stand without the predicate offenses (that is, the wire fraud crimes).

### V. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendants' "Motion[s] for Judgment of Acquittal or in the Alternative for Arrest of Judgment (Venue)" ("Venue Motions") is GRANTED;

IT IS FURTHER ORDERED that Defendants' "Motion for Judgment of Acquittal Pursuant to Rule 29(c) FRCrP and for Arrest of Judgment Pursuant to Rule 34 FRCrP" ("Materiality Motions") is GRANTED;

IT IS FURTHER ORDERED that the following motions are each DENIED AS MOOT: Defendants' "Motion[s] for Mistrial for Denial of Right of Counsel and for Mistrial (Green & Purtell)," Grisel's "Motion to Replace Counsel," David Herrington's [32] "Motion to Withdraw as Counsel," and the Government's "Motion Seeking Resolution of Rule 29 Motions and Other Pending Matters."

---

**32.** David Herrington is representing Grisel in this action.