### UNITED STATES of America, Appellee,

v.

**Lyle David PIERCE, III, a/k/a Sealed Defendant #2, a/k/a Joe Martin, a/k/a Joe Boy, and Regina Pierce, Defendants–Appellants.**

**Nos. 99–1437, 99–1496.**

United States Court of Appeals, Second Circuit.

Argued: April 28, 2000.

Decided: Aug. 22, 2000.

**160**

Bruce R. Bryan, Syracuse, NY, for Appellant Lyle David Pierce, III (Lyle David Pierce, III, pro se, filed an additional brief).

James E. Long, Albany, NY, for Appellant Regina Pierce.

Barbara D. Cottrell, Assistant United States Attorney, Albany, N.Y. (Daniel J. French, United States Attorney for the Northern District of New York and Gregory A. West, Assistant United States Attorney, of counsel), for Appellee United States of America.

Before: JACOBS, LEVAL, and SACK, Circuit Judges.

SACK, Circuit Judge:

In 1996 Lyle David Pierce, III, and his sister Regina Pierce, residents of the St. Regis Mohawk Indian Reservation, also known as Akwesasne, (the "Reservation") and five others were named as defendants in a single-count indictment accusing them of conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)-(2) and (h). In 1999, following a bench trial, the Pierces were convicted in the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge*).

Subsections 1956(a)(1)-(2) and (h) criminalize the conspiracy to use monies derived from or used to promote "specified unlawful activit[ies]" defined in subsection 1956(c)(7) of the statute. The "specified unlawful activity" in which the Pierces were accused of having engaged was a wire-fraud scheme in violation of 18 U.S.C. § 1343 to defraud the Canadian government of tax and duty revenue. The prosecution alleged that the Pierces transported or caused to be transported alcoholic beverages, mostly or entirely liquor, from the United States to Canada through the Reservation, and sold or caused the beverages to be sold in Canada. According to the indictment, the Pierces defrauded the Canadian government by evading the payment of Canadian taxes or duty on the transactions.

The government did not elicit proof at trial that the Canadian government imposes duty or taxes on such importation or sale of liquor. The existence of such duties or taxes payable to the Canadian government was essential to proving the scheme to defraud alleged in the indictment, which in turn was the "specified unlawful activity" required by § 1956. Because the government thus failed to establish a fact necessary to prove wire fraud, the Pierces' convictions cannot stand. We therefore reverse the judgments of conviction and direct that verdicts of acquittal be entered.

## BACKGROUND

*Facts*

The Reservation, roughly thirty square miles in area, straddles the St. Lawrence River. It lies within the State of New York and the Province of Quebec on the south side of the river, and the Province of Ontario on the north side of the river. In 1994 and 1995, the Pierces participated in a business venture in which frequent tractor-trailer truckloads of liquor, each worth

in the neighborhood of $100,000, were transported from various legitimate sources in the United States to the New York portion of the Reservation. The liquor was originally brought to warehouses owned and run by persons other than the Pierces, but eventually deliveries began to be made to a warehouse operated by Lyle Pierce. Regina Pierce worked at the warehouse, performing primarily clerical duties.[1]

From the Pierce warehouse, cases of the liquor were transported into Canada, typically by being ferried across a narrow stretch of the St. Lawrence River in the dead of night on flat-bottomed, lightless boats. Those responsible for the shipments assiduously avoided official border crossings, which are garrisoned by Canadian customs officers.

The liquor thus transported across the border was usually sold to Canadian customers for Canadian dollars. The alleged conspirators exchanged that currency for American dollars, which were used to purchase more liquor to be trucked to the warehouse on the Reservation. It is undisputed that "interstate and international telephone calls, facsimile, and wire transmission" were employed in the operation, as alleged in the indictment, and that neither Canadian taxes nor Canadian duty was collected by Canadian authorities on the sale or importation of the liquor.

The operation in which the Pierces were involved occasionally encountered legal difficulties and was frequently disrupted by squabbles amongst various persons having an interest in the operation or who had defected from or were competing with it. But federal and New York taxes were paid on the liquor,[2] the operation was otherwise in compliance with U.S. regulatory standards, and U.S. law-enforcement authorities, although in contact with the conspirators, for a time did not seek to put a halt to their operations. The United States Bureau of Alcohol, Tobacco and Firearms ("ATF") appears to have known about the operation throughout 1994, but did not make a serious attempt to stop it until early 1995, when the ATF issued an industry circular asserting that the type of cross-border enterprise in which the Pierces were involved as unlawful. In response to this letter, the operation's American suppliers stopped their alcohol shipments to the Reservation and the flow of liquor through the Reservation and across the St. Lawrence River came to a halt.

*The Prosecution*

On February 29, 1996, seven participants in the operation, including the Pierces, were indicted on one count of conspiracy to commit money laundering in violation of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)-(2) and (h). They were not charged with smuggling, wire fraud, or transporting currency across the border illegally.

18 U.S.C. § 1956, provides, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity . . .

.   .   .   .   .

shall be sentenced to a fine . . . or imprisonment . . . or both.

---

1. In light of our decision on this appeal, we need not and do not decide whether the evidence at trial was sufficient to establish beyond a reasonable doubt that Regina Pierce, whose role in the operation that is the subject of the indictment was largely clerical, was a member of the conspiracy alleged.

2. The operation began to pay New York excise taxes only after a truckload of alcohol was stopped by the New York authorities.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity . . .

.    .    .    .    .

shall be sentenced to a fine . . . or imprisonment . . . or both.

Subsection (c)(7) of the statute defines the term "specified unlawful activity" to include a wide array of criminal acts either described in the subsection or identified by reference to other statutes. *See* 18 U.S.C. § 1956(c)(7).

The Pierces were indicted for conspiracy to violate § 1956(a)(1) and (a)(2) in violation of subsection (h) of the statute which provides:

Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h).

The indictment alleged that the "specified unlawful activity" on the basis of which the Pierces violated the money-laundering law was "a wire fraud scheme to defraud the Canadian government of revenue" in violation of the wire fraud statute, 18 U.S.C. § 1343. Section 1343 provides for the fine or imprisonment of any person who,

. . . having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or

sounds for the purpose of executing such scheme or artifice. . . .

The theory of the prosecution of the Pierces under 18 U.S.C. § 1956(a)(1) and (h), then, was that they (i) had conspired (ii) knowingly to conduct a financial transaction (the changing of Canadian money into U.S. currency) (iii) that "in fact involve[d]" the proceeds of wire fraud (the "specified unlawful activity") (iv) with knowledge that the money represented the proceeds of wire fraud and (v) with the intent to promote the carrying on of further wire fraud. The wire fraud consisted of (vi) using communications in interstate and foreign commerce for the purpose of executing a scheme that the Pierces had devised "to defraud the Canadian government of revenue" by fraudulently avoiding the duty and taxes owed on the liquor they had caused to be imported into and sold in Canada.

The theory of the prosecution under 18 U.S.C. § 1956(a)(2) and (h) was that the Pierces (i) had conspired (ii) to transport, transmit, or transfer funds between Canada and the United States (iii) with the intent to promote the carrying on of wire fraud (the "specified unlawful activity"). Again, the wire fraud consisted of (iv) using communications in interstate and foreign commerce for the purpose of executing a scheme that the Pierces had devised "to defraud the Canadian government of revenue" by fraudulently avoiding duty and taxes owed on liquor they had caused to be imported into and sold in Canada.

■ Thus, although the Pierces were not directly charged with committing or conspiring to commit wire fraud under § 1343, proof beyond a reasonable doubt that they had intended to promote wire fraud in the course of their operations was required for conviction on the money laundering charge. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of

every fact necessary to constitute the crime with which he is charged.").

In 1996 all the indicted defendants moved to dismiss the charges against them, relying on *United States v. Boots*, 80 F.3d 580 (1st Cir.1996). In *Boots*, Native American defendants had been convicted of, *inter alia*, wire fraud directly under § 1343 involving a scheme to transport tobacco across their reservation and into Canada and to sell it in Canada without paying Canadian customs duty or taxes. *See id.* at 582–83. The First Circuit reversed the convictions, holding that because "the object of the scheme ... was exclusively to defraud a foreign government, rather than our own, of customs and tax revenues imposed under foreign law," prosecution of the scheme was prohibited by the "revenue rule." *Id.* at 586–87. The First Circuit explained:

> The "revenue rule"—a firmly embedded principle of common law, traced to an opinion by Lord Mansfield, *Holman v. Johnson*, 98 Eng. Rep. 1120 (K.B. 1775)—holds that courts generally will not enforce foreign tax judgments, just as they will not enforce foreign criminal judgments.... The rationale of the revenue rule has been said to be that revenue laws are positive rather than moral law; they directly affect the public order of another country and hence should not be subject to judicial scrutiny by American courts; and for our courts effectively to pass on such laws raises issues of foreign relations which are assigned to

and better handled by the legislative and executive branches of government.

*Id.* at 587 (citations omitted).[3] The behavior alleged to be criminal in *Boots* was therefore held by the First Circuit to be "beyond the parameters of the frauds cognizable under section 1343." *Id.* at 586.

On December 20, 1996, the United States District Court for the Northern District of New York (Rosemary S. Pooler, *Judge*) granted the defendants' motion to dismiss, *see United States v. Trapilo*, No. 96–CR–54 (RSP), 1996 WL 743837, 1996 U.S. Dist. LEXIS 19237 (N.D.N.Y. Dec. 20. 1996), holding that it was required to do so under the "revenue rule" and *Boots*. *See id.*, 1996 WL 743837, at *4, 1996 U.S. Dist. LEXIS 19237, at *10. The district court reasoned that "[i]f the law [the defendants] intended to violate was not valid, the defendants could not have had a criminal intent" and that it was thus impossible to determine whether they had a criminal intent without improperly considering the validity of a foreign revenue rule. *Id.*

The government appealed and we reversed. *See United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997) ("*Trapilo*"). After reviewing several wire fraud decisions,[4] *id.* at 551–52, we concluded that "[t]hese cases teach, as the [wire fraud] statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme whereby one *intends* to defraud another of property." *Id.* at 552 (emphasis in original). "The statute reaches *any* scheme to defraud involving money or property, wheth-

---

**3.** We noted in *United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997), discussed below, however, that in the Third Restatement of Foreign Relations Law the reporters observed that "[i]n an age when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete." *Id.* at 550 n. 4 (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 483, Reporters Note 2 at 613 (1987)).

**4.** *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); *Durland*

v. *United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896); *United States v. Helmsley*, 941 F.2d 71 (2d Cir.1991), *cert. denied*, 502 U.S. 1091, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992); *United States v. DeFiore*, 720 F.2d 757 (2d Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984); *United States v. Eskow*, 422 F.2d 1060 (2d Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970); *United States v. Fromen*, 265 F.2d 702, 705 (2d Cir.), *cert. denied*, 360 U.S. 909, 79 S.Ct. 1295, 3 L.Ed.2d 1260 (1959); *Gregory v. United States*, 253 F.2d 104 (5th Cir.1958).

**164**

er the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments." *Id.* (emphasis in original). We disagreed with *Boots* that prosecution of activity such as that in which the Pierces were alleged to have engaged violated the "revenue rule." *See id.* at 549.

> At the heart of th[e] indictment [under which the Pierces and their co-defendants were charged] is the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws. The statute condemns the intent to defraud, that is, the forming of the scheme to defraud, however and in whatever form it may take. The intent to defraud does not hinge on whether or not the appellees were successful in violating Canadian revenue law, as section 1341 [18 U.S.C. § 1341, the federal fraud statute] punishes the *scheme*, not its success.

*Id.* at 552 (citations, internal quotation marks, and alteration omitted; emphasis in original). We remanded the case to the Northern District of New York for further proceedings.

The government has informed us that following the remand, all of the defendants save the Pierces entered into plea agreements with the government pursuant to which they pleaded guilty to the charges against them contained in the indictment. *See* Gov't Br. at 2. After a bench trial before Judge McAvoy, Regina and Lyle Pierce were convicted and sentenced to fifty-one months' and 151 months' imprisonment, respectively.

On appeal, the Pierces argue, *inter alia,* that insufficient evidence was introduced at trial to support their convictions. Specifically, they assert that the government failed to establish that Canada imposed duty or taxes on the importation or sale of liquor such as that which they transported or caused to be transported across the border. At oral argument, we requested that the parties assist us by way of supplemental briefing identifying the testimony or other evidence at trial that established beyond a reasonable doubt that applicable Canadian revenue laws in fact existed. The additional briefing confirmed what the trial record, the original briefing, and oral argument had suggested: There was no such testimony or other evidence. On May 9, 2000, shortly after receiving the supplemental briefs, we ordered the district court to release the Pierces on their own recognizance pending resolution of this appeal. We now reverse the judgments of conviction and direct that verdicts of acquittal be entered in favor of the Pierces.

## DISCUSSION

We must affirm the Pierces' convictions if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). When reviewing a claim of insufficiency of the evidence, "the standard of review is exactly the same regardless whether the verdict was rendered by a jury or by a judge after a bench trial." *McCarthy v. New York City Technical College of City Univ. of New York,* 202 F.3d 161, 166 (2d Cir.2000); *see also United States v. Zabare,* 871 F.2d 282, 284, 286 (2d Cir.1989) (applying same standard of review after bench trial in criminal case). While "a defendant shoulders a 'heavy burden' in challenging the sufficiency of evidence supporting a conviction," *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) (quoting *United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994)), we must be satisfied that after drawing all permissible inferences in favor of the government, a rational trier of fact could find that every element of the crime was established beyond a reasonable doubt. *See United States v. Workman,* 80 F.3d 688, 699 (2d Cir.1996).

The government argues that the Pierces conspired to launder money in furtherance, and using the profits, of an illegal wire-fraud scheme. To obtain a conviction under § 1956(a)(1), the government was required to demonstrate that the defendants engaged in financial transactions that "in fact involve[d] the proceeds" of wire fraud. Under § 1956(a)(2)(A), the government had to establish that the Pierces moved funds internationally with "the intent to promote the carrying on of" the wire fraud scheme. It was therefore necessary for the government to show that the scheme of which the Pierces used the proceeds or intended to promote actually was an illegal wire-fraud scheme.

■■■ The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires. *See Autuori,* 212 F.3d at 115. To establish the first element, the government must prove (i) the existence of a scheme to defraud, *see United States v. D'Amato,* 39 F.3d 1249, 1256–57 (2d Cir.1994), (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, *see id.* at 1257, and (iii) the materiality of the misrepresentations, *see Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

■■■ The indictment accuses the Pierces and their alleged co-conspirators of engaging in wire fraud in violation of 18 U.S.C. § 1343 by using "interstate and international telephone calls, facsimile, and wire transmissions" in a scheme "to defraud the Canadian government of revenue" from taxes and duty due on the liquor imported into and sold in Canada. In the context of mail fraud and wire fraud, "the words 'to defraud' commonly refer 'to wronging one in his property rights by

dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or over-reaching.'" *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Hammer-schmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)); [5] *see also Trapilo,* 130 F.3d at 551 ("The [wire fraud] statute is limited in scope to the protection of money or property rights."). A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with. *See Carpenter v. United States,* 484 U.S. 19, 27–28, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (scheme surreptitiously to appropriate newspaper's unpublished information for purpose of engaging in securities trading is fraudulent under wire fraud statute because such confidential information is property); *cf. United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (plan to engage in deceit is not, without more, scheme to defraud under the mail fraud statute; contemplated harm to victim required).

The Pierces were accused of "wronging" the Canadian government, *McNally,* 483 U.S. at 358, 107 S.Ct. 2875, by tricking or deceiving it, not to obtain money from it, but to deprive it of its right to collect money in tax and duty revenue. That makes this appeal somewhat unusual. The Pierces are not accused of scheming to defraud the Canadian government of its property, but of its *right* to obtain property, its *right* to be paid money. To prove the existence of a scheme to defraud the Canadian government the prosecution had to prove the existence of such a right.[6] Without it there was no "money or proper-

**5.** *McNally* was a mail fraud case, but "[t]he wire fraud statute, 18 U.S.C. § 1343, is the 'lineal descendant' of the mail fraud statute," *Trapilo,* 130 F.3d at 551 n. 7 (citing *McNally,* 483 U.S. at 374, 107 S.Ct. 2875), and "'[b]e-cause these statutes use the same relevant language, they are analyzed in the same

way,'" *id.,* (quoting *United States v. Slevin,* 106 F.3d 1086, 1088 (2d Cir.1996)).

**6.** Lyle Pierce, appearing *pro se,* emphatically made this argument to the district court during his trial.

ty," *Autuori*, 212 F.3d at 115, of which the Canadian government could be defrauded.

■■■■ To be sure, to establish a scheme to defraud for purposes of the wire fraud statute the prosecution need not show that the scheme in fact resulted or would have resulted in a loss to the person who is the target of the plan. If, for example, the government had shown that the Pierces engaged in a scheme to defraud the Canadian government of import duty in fact imposed by Canadian law, but that duty never became payable because no liquor ever actually made its way across the border, the scheme itself would nonetheless be punishable. "[The wire fraud statute] punishes the scheme, not its success." *Trapilo*, 130 F.3d at 552 (emphasis, citation, and internal quotation marks omitted). But without evidence that Canada imposes duty on imported liquor in the first place, the government cannot prove a scheme to defraud the Canadian government because there is no evidence whatsoever of a property right—a right to revenue—of which the Canadian government could be defrauded. If no Canadian duty or tax actually existed, the Pierces were no more guilty of wire fraud than they would have been had they used the wires in furtherance of a scheme surreptitiously to transport liquor down the Hudson River from Yonkers into New York City, by flat-bottomed boat in the dead of night, in the sincere but mistaken belief that New York City imposes a duty on such cross-border shipments.

*United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir.1991), *cert. denied*, 502 U.S. 1091, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992), helps illustrate the point. There we held that the defendant Helmsley was guilty of mail fraud because of false statements that she made on her New York State tax returns notwithstanding the government's failure to prove that she actually underpaid her New York State taxes. *See*

*id.* at 94. "The absence of proof of taxes actually due to New York State is immaterial because success of a scheme to defraud is not required." *Id.* But we did not suggest in *Helmsley* that the *existence* of a New York State income tax was irrelevant to the conviction. If in fact there had been no state income tax and therefore no property right of the State of New York with which the defendant might interfere, we do not think that the defendant's plan to make misleading statements to the State would have constituted a scheme to defraud New York State of income tax revenue.

■■ There is no evidence in the record demonstrating the existence of a Canadian duty or tax on the cross-border transportation of liquor or the sale of U.S.-tax-paid liquor imported from the United States. There is nothing in the record from which a finder of fact could conclude beyond a reasonable doubt that there was such a duty or tax. No Canadian statutes are named, no Canadian practices or policies are described, and no experts on Canadian law testified. And while the government demonstrated that the conspirators often acted evasively while conducting their business operations, a juror could not infer the existence of a Canadian tax or duty from the defendants' suspicious behavior alone.

■■ United States Border Patrol Senior Special Agent David J. Grose, qualified by the district court as an expert on smuggling activity in northern New York, testified that "the Royal Canadian Mounted Police and the other provincial and local police departments in Canada, they identified the liquor and tobacco that went through the St. Regis Mohawk Indian Reservation as an illegal contraband entering into Canada illegally and going to the black market."[7] "Contraband" is "illegal or prohibited traffic" or "goods or mer-

---

7. Grose, admitting that he was not an expert on Canadian law, testified: "[A]ll I can say is I know it's a violation of Canadian law, to also enter without inspection or move contraband across without inspection."

chandise the importation, exportation, or sometimes possession of which is forbidden." *Webster's Third New International Dictionary* 494 (1981). The Pierces' liquor may very well have been illegally imported, but that does not establish that Canadian tax was due upon its sale or that the Pierces conspired to defraud or promote the defrauding of the Canadian government of the revenues from such taxes.

There was also evidence before the court indicating that the conspirators crossed the border into the United States while carrying undeclared sums in excess of $10,000, which they knew to be illegal under federal law. And Chief Judge McAvoy noted during Special Agent Grose's testimony that he did not "think there[ was] anybody in this room that's not familiar with" the fact that smuggling is illegal under Canadian law. But none of that is evidence that the Canadian government imposes a duty or tax on liquor transported into or sold in Canada.

Lyle Pierce, acting as his own counsel, read into the trial record a portion of the grand jury testimony of one of his co-conspirators, Chester J. Zwissler, Jr., to the effect that Pierce himself had told Zwissler that it was "illegal" to drive an undeclared truckload of liquor across an international bridge. The Pierces argued vigorously below, and continue to argue vigorously before this Court, that their cross-border operations were nonetheless legal because they took place on the Reservation and were largely conducted by Native Americans. They assert that such operations are tax-free under Canadian law and that the government therefore could not have proved that they deprived the Canadian government of any revenue. It is difficult to understand why the Pierces repeatedly used stealth tactics if they thought what they were doing was lawful. But proof that the Pierces thought, or acted as though they thought, that what they were doing was illegal, or that their view of the law was flawed or feigned, does not establish that they were guilty of the crime of which they were charged. For that crime, proof of the existence of a scheme to defraud the Canadian government of revenue was necessary.

Our decision in *Trapilo* is not to the contrary. It stands for the proposition that money laundering in the course of a scheme to deprive the Canadian government of tax and duty revenue may be prosecuted by the United States government in an American court under 18 U.S.C. § 1956(a)(1-2) and (h). There we assumed, *see Trapilo*, 130 F.3d at 552, in order to decide the appeal from the dismissal of the indictment, that the government would prove at trial what the indictment alleged: that the defendants conspired to "participate in an illegal venture to smuggle liquor from the United States into Canada where it would be sold on the 'black market' *to avoid the payment of Canadian taxes and duties.*" (emphasis added). We held that the prosecution would not violate the "revenue rule" because demonstrating an intent to defraud the Canadian government of duty or taxes is not dependent on showing that those taxes are valid, nor is it equivalent to an effort to collect those taxes on Canada's behalf. *See id.* at 552–53. "The [wire fraud] statute," we concluded, "condemns the intent to defraud, that is, the forming of the scheme to defraud, however and in whatever form it may take." *Id.* at 552 (citation and internal quotation marks omitted).

We did not say or suggest in *Trapilo*, however, that it did not matter whether Canada in fact taxed or levied a duty on liquor sales or imports, or that a guilty mind without something about which to feel guilty was a crime. And while we assumed in *Trapilo* that the government would be able to prove what the indictment alleged, we must on this appeal determine whether the government·in fact did so at trial. One element of the crime of which the Pierces were charged was that they conspired to promote, or use the

profits, of a scheme to defraud the Canadian government of tax or duty. In the absence of any proof of such tax or duty, there was no such scheme to defraud. The evidence on that element of the crime having been not only insufficient but nonexistent, the judgments of conviction must be reversed.

## CONCLUSION

Because a fact necessary to prove the crime charged was not proved, acquittal was mandatory. We therefore reverse the trial court's judgments of conviction and direct that verdicts of acquittal be entered in favor of the Pierces.