**Eric BUTLER, Movant,**

v.

**UNITED STATES of America.**

**No. 13–CV–4639.**

United States District Court, E.D. New York.

Jan. 17, 2014.

Paul T. Weinstein, Esq. Emmet, Marvn & Martin, LLP, New York, NY, for Movant.

Daniel A. Spector, John P. Nowak, United States Attorney's Office, Brooklyn, NY, for the United States.

**MEMORANDUM, ORDER, AND JUDGMENT ON 28 U.S.C. § 2255 MOTION**

JACK B. WEINSTEIN, Senior District Judge.

### Table of Contents

I. Introduction ................................................................169

II. Facts.........................................................................169

III. Trial ........................................................................171

IV. Appeals ...................................................................171

V. Movant's Claims .......................................................172
 A. Procedural Bar......................................................172
 1. Failure to Disclose Information .................................172
 2. Extraterritoriality.............................................172
 3. Actual Innocence..............................................172
 4. Conclusion ...................................................172
 B. *Brady* and *Giglio* Violations.....................................172
 1. Law ..........................................................172
 2. Application of Law to Facts ...................................173
 i. Glaxo ....................................................173
 ii. Medis Technologies and Lumec .............................174
 iii. S & P ....................................................175
 C. Securities Fraud under 10(b) .......................................175
 1. Change of law ................................................175
 2. Extraterritorial Application of section 10(b)....................175
 3. Domestic Transaction Defined .................................176

 i. *Morrison* ...............................................................176
 ii. *Absolute Activist* ........................................................177
 iii. *Vilar* ..................................................................177
 4. Application of Law to Facts ...........................................177
 D. Wire Fraud Conspiracy ...............................................179
 1. Law .................................................................179
 2. Application of Law to Facts ...........................................179

VI. Certificate of Appealability ...............................................179

VII. Conclusion .............................................................179

## I. Introduction

Eric Butler moves to vacate his criminal conviction and sentence. *See* 28 U.S.C. § 2255. In the alternative he requests a new trial. *See* Fed.R. Crim.P. 33. He is currently serving a five year sentence imposed on August 23, 2011 for conspiracy to commit securities fraud, securities fraud, and conspiracy to commit wire fraud.

He states two grounds for relief. First, he claims that the government withheld exculpatory information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *See* Pet'r's section 2255 Mot. ("Pet'r's Br.") 1130, CM/ECF No. 1. Second, he alleges that new interpretations of securities fraud law excluding prosecutions from foreign-based transactions render his conviction invalid. *See id.* at 31–38 (relying on *Morrison v. National Australia Bank,* 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) and *U.S. v. Vilar,* 729 F.3d 62 (2d Cir.2013)).

A non-evidentiary hearing was held on January 15, 2014. Movant was represented by counsel and present via telephone.

The motion is denied.

## II. Facts

Auction Rate Securities ("ARS") were securities composed of long-term, usually high-grade, debt obligations. *See U.S. v. Tzolov,* 642 F.3d 314, 316–17 (2d Cir.2011). The underlying collateral included student loans, mortgages, municipal bonds, corporate debt, and preferred stock issued by closed-end mutual funds. *See id.* The maturity on these debt obligations was usually thirty years, but ARS were traded through auctions on short-term cycles. *See id.* Auctions took place every 7, 14, 28, or 35 days. *See id.* At the end of a cycle, the ARS could either be sold through an auction, or the investor could hold the security for another cycle. *See id.* ARS were not listed on exchanges.

The structure of the product and short-term auction cycle attracted investors interested in additional basis points and liquidity. *See id.* Prior to the failure of the market, an investor could exchange his security for cash potentially every week or month. *See id.* If an investor instead decided to hold his ARS, the principal would be returned when the underlying security matured many years later. *See id.*

The federal government guaranteed against default up to 98 percent of the underlying principal of ARS backed by student loans. *See id.* Other types of ARS did not carry this guarantee. *See id.*

The auctions for non-student loan-backed ARS began to fail in August 2007. *See id.* The failure effectively eliminated the market for these securities because investors could not resell the product through short-term auctions. *See id.*

His co-conspirator, Julian Tzolov, and Butler worked at Credit Suisse's Manhattan office in the Corporate Investment Management group. *See Tzolov,* 642 F.3d at 317. When clients had excess cash, based upon advice from Butler and Tzolov, they invested it in securities products that earned the substantial interest associated with long-term securities and provided the liquidity of short-term investments. Many clients were large, international corporations with total investments of many millions of dollars.

In 2005 and 2006, these conspirators presented corporate clients with ARS as an investment product. *See id.* These were long term loans split into short term investments readily convertible to cash. The presentations focused on ARS incorporating student loans because of the federal guarantee. *See, e.g.,* Trial Tr., 1624, Aug. 3, 2009, CM/ECF No. 360; *Tzolov,* 642 F.3d at 317.

To present ARS to clients, Butler and Tzolov sometimes traveled out of the country. *See, e.g., Tzolov,* 642 F.3d at 317; Trial Tr., 1624, Aug. 3, 2009. At other times their merchandizing was conducted over the phone or via email from the United States. *See Tzolov,* 642 F.3d at 317; Trial Tr., 629, July 27, 2009, CM/ECF No. 376. From both this country and abroad, they provided clients with misleading and false information. *See* Trial Tr., 2357–71, Aug. 10, 2009, CM/ECF No. 355.

When a client decided to invest in student loan-backed ARS, they contacted Butler and completed Credit Suisse's account opening documents. *See* Trial Tr., 1019–20, July 28, 2009, CM/ECF No. 377. This process included starting New York based brokerage accounts with Credit Suisse and completing tax documentation that exempted the transactions from United States tax withholding. *See* Mem. in Opp'n of 2255 Mot. ("Mem. in Opp'n") 2,

CM/ECF No. 10 (Ex. 3B). The accounts were non-discretionary, which meant Butler could not unilaterally make a purchase without a client's permission. *See, e.g.,* Trial Tr., 2404, Aug. 10, 2009; Trial Tr., 2220–21, Aug. 6, 2009, CM/ECF No. 352.

The excess cash the corporation wished to invest was wired from a foreign country to the United States. *See* Trial Tr., 313839, Aug. 13, 2009, CM/ECF No. 358. Contrary to clients' instructions to purchase student loan-backed ARS, Butler purchased non-government guaranteed ARS. *See Tzolov,* 642 F.3d at 317. Obtaining a higher commission was the primary purpose of investing in non-student loanbacked ARS. *See* Trial Tr., 2203–07, Aug. 6, 2009.

Prior to each auction in which a client held eligible securities, Butler contacted the client, from New York, to ask whether it wished to liquidate or hold the security for another cycle. Orders were taken by phone or by email in New York. *See, e.g.,* Trial Tr., 1664, Aug. 3, 2009; Trial Tr., 184849, Aug. 4, 2009, CM/ECF No. 361. Once Butler received instructions from the client, he relayed the order to a trader in New York, who executed the purchase or sale here. *See* Trial Tr., 303640, Aug. 13, 2009. All ARS trades went through a trading desk in New York. *See id.* at 3078. Sometimes the trades were executed between two Credit Suisse clients, known as cross-trades. *See id.* at 3030–32. Other trades were executed between Credit Suisse and Wall Street banks such as Merrill Lynch, Deutsche Bank, JP Morgan, and Lehman Brothers in New York. *See id.* at 3040–41, 3053, 3081.

Email confirmations sent to the client after the completion of trades falsely indicated that student loan ARS were purchased when in fact other, non-guaranteed collateral backed the securities. *See Tzolov,* 642 F.3d at 317. Paper confirmations

for the same trades were sent from Credit Suisse to the clients at a later date. *See id.* The paper confirmations indicated the correct name of the securities purchased. *See id.*

Auctions for non-student loan-backed ARS failed in 2007. Butler's clients who held these securities could not sell them on a short-term basis.

## III. Trial

At trial, the government introduced witnesses from six of Butler's former clients: Randgold Resources Ltd. ("Randgold"), Potash Corporation ("Potash"), Copa Airlines ("Copa"), Roche International ("Roche"), STMicroelectronics ("STMicro"), and GlaxoSmithKline ("Glaxo"). Pet'r's Br. at 15. Witnesses from Randgold, Potash, Copa, and Roche testified that they ordered the purchase of student loan-backed ARS, but Butler purchased other types of ARS. *See id.* One investment criteria for clients was that the ARS be AAA rated. AAA rating was important, but it was not central. *See, e.g.,* Trial Tr., 1016, July 28, 2006; Trial Tr., 1621, Aug. 3, 2009. The key feature was the government guarantee.

Glaxo's testimony at trial was similar to that of the others. The difference was that Glaxo exited the ARS market before it crashed. It did not suffer losses as a result of Butler's unauthorized activities. *See* Trial Tr., 1900, Aug. 4, 2009, CM/ECF No. 361.

Cooperating with the government, Tzolov testified against Butler. *See* CM/ECF No. 352, 355, 356, 357, 358; Trial Tr., 2483–84, Aug. 10, 2009. His motives and veracity were thoroughly attacked at trial. *See* Trial Tr., 2147, Aug. 6, 2009; Trial Tr., 2476–2506, Aug. 10, 2009.

## IV. Appeals

The Court of Appeals affirmed each of the conspiracy counts and vacated the securities fraud count for improper venue. *See U.S. v. Tzolov,* 642 F.3d 314, 316 (2d Cir.2011). Resentencing was ordered. *See id.* Butler's other contentions on appeal were rejected under a separate summary order. *See U.S. v. Tzolov,* 435 Fed. Appx. 15 (2d Cir.2011) (dismissing arguments of evidentiary error and sentencing miscalculation). The district court issued a Memorandum and Order setting the schedule for resentencing. Mem. and Order, 08–cr–370, CM/ECF No. 429.

Brought against Butler in 2009 in the Southern District of New York was another case, alleging seven counts of wire fraud. Indictment, *United States v. Butler,* 11–cr–588 (E.D.N.Y. July 27, 2011), CM/ECF No. 2. This case was transferred to the Eastern District of New York in 2011. Order of Transfer, *United States v. Butler,* 11–cr–588 (E.D.N.Y. Aug. 15, 2011), CM/ECF No. 1.

In a single proceeding on August 23, 2011, Butler waived all objections to venue in both cases. Waiver, 08–cr–370, CM/ECF No. 462. He pled guilty to the vacated count of securities fraud in this court and to the seven Southern District counts of wire fraud. Butler was sentenced to concurrent sentences of five years imprisonment, a $250,000 forfeiture, and a $5 million fine. *See* Addendum to Sentencing Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2), 08–cr–370, CM/ECF No. 469.

Butler appealed from the new sentence on two grounds, both rejected by the Court of Appeals. *See U.S. v. Butler,* 501 Fed.Appx. 8, 9 (2d Cir.2012). He argued that new evidence suggested that no one— not even sophisticated buyers—understood the risks of the housing market and thus he could not have foreseen the losses. *See*

*id.* at 9–10. The Court of Appeals held that he "manifestly placed his victims at risk of loss by lying about the type of securities he was purchasing on their behalf," and telling them "that he was purchasing securities created from government-guaranteed student loans, when in fact he was purchasing instruments tied to the housing market, in which loans were not government guaranteed." *Id.* It found movant's second argument—the district court did not appreciate his "extensive post-sentencing rehabilitation efforts," upon resentencing—equally without merit. *Id.* at 10.

## V. Movant's Claims

### A. Procedural Bar

 A motion under section 2255 is not a substitute for an appeal. *See Sapia v. United States,* 433 F.3d 212 (2d Cir. 2005). A movant must raise a section 2255 claim during the pretrial, trial, or appellate phases of his criminal proceeding. "Absent a fundamental miscarriage of justice, a federal prisoner who fails to raise an issue on direct appeal cannot subsequently raise the issue in a section 2255 petition unless he can show cause for his failure to raise the issue on appeal." *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *see also Underwood v. United States,* 166 F.3d 84, 87 (2d Cir.1999) (citing *Campino v. United States,* 968 F.2d 187, 190 (2d Cir.1992)). Where a criminal defendant has procedurally forfeited his claim by failing to present it on direct review, the claim may be raised in a section 2255 motion only if the movant can demonstrate either (1) cause for failing to raise the issue and actual prejudice from the alleged error, or (2) actual innocence. *See Sapia,* 433 F.3d at 217; *Frady,* 456 U.S. at 168, 102 S.Ct. 1584.

### 1. Failure to Disclose Information

 The government contends that movant's claims with respect to Medis Technologies ("Medis") and Lumec are procedurally barred because information concerning those companies was disclosed prior to his initial sentencing in 2010, making that information available to him in advance of his first appeal. Mem. in Opp'n at 14. He appears not to have raised this issue on appeal. This position is not preserved. *See United States v. Tzolov,* 642 F.3d 314 (2d Cir.2011).

### 2. Extraterritoriality

Butler argues that the extraterritoriality holding in *Morrison v. National Australia Bank,* 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) extends to wire and fraud charges. He has not established cause for failing to raise this issue on appeal.

### 3. Actual Innocence

Butler has not established actual innocence.

### 4. Conclusion

Movant's claims of *Brady* violations regarding Medis and Lumec, the securities fraud charge under section 10(b), and the wire fraud charge are all procedurally barred. Despite the procedural bar, the lack of merit is discussed below.

### B. *Brady* and *Giglio* Violations

#### 1. Law

 The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A finding of materiality of the evidence is required under *Brady.*" *Giglio v. United States,* 405 U.S. at 154, 92 S.Ct. 763. Ex-

culpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Nondisclosure merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

■■■ The Supreme Court has rejected a distinction between impeachment evidence and exculpatory evidence. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375. Impeachment evidence "is 'evidence favorable to an accused,' *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* New evidence that is nothing more than consecutive, non-compelling impeachment material does not warrant a new trial. *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981).

■■■ "[T]he *Brady* obligation extends only to *material* evidence ... that is known to the prosecutor." *United States v. Avellino,* 136 F.3d 249, 255–56 (2d Cir. 1998) (emphasis added) (imputation of government's knowledge of a state investigation ultimately did not need to be decided because "the undisclosed information [did] not meet the test for *Brady* materiality. . . ."). Materiality is measured by the effect upon preparation for trial rather than the predicted effect on the jury. *See U.S. v. Bravo,* 808 F.Supp. 311, 319 (S.D.N.Y.1992).

■■■ Should the government deliberately fail to disclose, the standard is less stringent. *See id.* ("If it can be shown that the Government deliberately suppressed evidence, a new trial is warranted if the evidence is merely material or favorable to the defense.") (internal quotations omitted) (citing *United States v. Kahn,* 472 F.2d 272, 287 (2d Cir.1973)).

■■■ Knowledge of an investigation by one unit of the government may be imputed to other governmental institutions. *See Bravo,* 808 F.Supp. at 320 n. 10 ("For purposes *of Brady* ... the Government is but a single entity, each member of which is charged with the knowledge of the whole.").

### 2. Application of Law to Facts

#### i. Glaxo

■■■ Movant argues that the prosecution impermissibly withheld information about a government investigation into Glaxo for health care fraud. Pet'r's Br. at 19. Relying on a plea agreement with the government and Glaxo, movant assumes that Glaxo "was motivated to cooperate with the government in order to decrease its criminal exposure." *Id.* at 19. Details about the Glaxo investigation and agreement became public in 2012. Pet'r's Br. at 18 (Ex. 2).

The Glaxo witnesses were from only one of many investors who were fed false information by Butler. A jury may have added weight to Glaxo's testimony because it had "no ax to grind ... [having gotten] got out of this without losing a dime." Trial Tr., 3339, Aug. 14, 2009, CM/ECF No. 359. Lack of losses notwithstanding, the testimony was practically identical to that of representatives from other investors who testified. Because the Glaxo witness was not adding much to the trial, the court encouraged the government to move their testimony along. *See* Trial Tr., 188586, Aug. 4, 2009.

According to movant, Glaxo provided the most important witness. Pet'r's Br. at 16. This is a gross exaggeration. Witnesses from six different victim companies consumed approximately seven days at trial. Between the prosecution and defense counsel, approximately four days were spent questioning Tzolov under oath. The emphasis on Tzolov, even considering his potential lack of credibility, was significant. He was the prosecution's star witness.

Had the prosecution disclosed the ongoing government investigation into Glaxo, the result would not have been different. The parties conducted detailed direct and cross examination on multiple witnesses and introduced thousands of pages of documentary evidence over a three week trial. Glaxo materials were merely duplicative, with little independent weight.

There is overwhelming support in the record demonstrating that Butler defrauded many investors, including Glaxo. Any alleged nondisclosure does not "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Kotteakos v. U.S.*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (substantial influence on out of case); *Matusick v. Erie Cnty. Water Auth.*, 739 F.3d 51, 70–72 (2d Cir.2014) (harmless error).

### ii. Medis Technologies and Lumec

■ Movant contends that the government failed to disclose evidence that Butler interacted with clients who were interested in investing in both student loan-backed and non-student loan-backed ARS. Pet'r's Br. at 23. Medis and Lumec were two companies the government identified in a victim notification letter prior to sentencing that fit such a profile. *See* Gov't Letter, *United States v. Butler*, 08–cr–370, Jan. 21, 2010, fn. 1, CM/ECF No. 336. Neither of these victims were presented through witnesses at trial.

Defendant was free to show that some clients, like Medis and Lumec, were willing to accept ARS backed by non-student loan collateral. *See id.* During cross-examination of Tzolov, the defense turned over to the prosecution thousands of pages of documents related to clients who were not victims of the ARS scheme. *See* Trial Tr., 253340, Aug. 11, 2009. Butler knew that such clients existed and could have presented them as witnesses for the defense.

But the defense called no witnesses. *See* Trial Tr., 3177, Aug. 13, 2009. Instead, during cross examination of government witnesses, counsel focused on the clients' reliance on email confirmations as opposed to mailed statements and prospectuses. This was powerful proof. It showed that managers of clients with hundreds of millions of dollars in investments never bothered to read the formal prospectuses and available reports contradicting Butler's misleading notices.

Even if Medis and Lumec's desire for mixed collateral had been disclosed at trial, it would not have been enough to overcome the evidence and testimony presented by the government. *See* Hr'g Tr. 14–15. The prosecution never asserted that Butler defrauded all of his customers. Instead, it focused on six victims, each of whom were always clear about their desire to purchase only government guaranteed student loan-backed ARS. Medis, Lumec, and other "Non–Trial Victims" were presented only for purposes of sentencing after conviction. *See* Gov't Letter, *United States v. Butler*, 08–cr–370, Jan. 21, 2010.0

Movant also postulates that Tzolov must have provided information about Medis and Lumec to the government. *See* Pet'r's Br. at 24–25. Hypothesizing about what Tzolov might have said to the government, movant asserts that *Giglio* violations occurred. Pet'r's Br. at 24 ("[I]f Tzolov had

stated that Medis Technologies and Lumec were defrauded, that would have been a false allegation of fraud by Tzolov against the defendant ... and thus key *Giglio* material at trial.").

If Tzolov told the government more about Medis and Lumec, the result would not have been different. The parties' direct and cross examined multiple witnesses and introduced thousands of pages of evidence. The hypothetical possibility that a witness, with diminished credibility, may have provided the government with information about clients who preferred a variety of collateral, would not have changed the outcome. References to other information available after trial, even if known before trial, would not have affected the jury's decision.

### iii. S & P

■■■■ AAA ratings assigned by Standard & Poor's ("S & P") were extravagantly optimistic and improperly predicated on the packaging of loans that were not of AAA quality. Butler's clients asked for and expected an extra guarantee by the government and were entitled to receive what they asked for. *See, e.g.,* Trial Tr., 453–54, July 23, 2009, CM/ECF No. 373. AAA rating was only one of several conditions these clients placed on the purchases Butler made. The government guarantee—not the AAA rating—was the primary selling point during the pitch to clients. *See, e.g.,* Trial Tr. 986, 99091, 1016, July 28, 2009; Trial Tr. 162022; 1637, Aug. 3, 2009.

Regardless of the credit rating, Butler departed significantly from his clients' mandates. He changed the names of securities in confirmation emails to mislead customers about the purchases. *See Tzolov,* 642 F.3d at 317. He collected a higher rate of commission due to the improper purchases. None of these actions would be any less culpable because AAA ratings were attached to the securities. The AAA ratings may have helped Butler attempt to justify his actions, but it does not change the fact that he purchased ARS that were not backed by government guaranteed student loans, in direct contravention of instructions.

Had the prosecution disclosed an ongoing government investigation into S & P, the result in this case would not have been different. The parties direct and cross examined multiple witnesses and introduced thousands of pages of evidence. The discovery that S & P was being investigated would not have changed the outcome of this case.

### C. Securities Fraud under 10(b)

#### 1. Change of law

■■■■ Collateral relief under section 2255 is justified if there is a change in the law that "inherently results in a complete miscarriage of justice and present(s) exceptional circumstances." *Davis v. U.S.,* 417 U.S. 333, 346–47, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (internal quotation marks omitted) (following a change in the law, movant's "punishment and conviction [were] for an act that the law does not make criminal ..."). A change in the law does not automatically result in collateral relief. *See Wright v. U.S.,* 732 F.2d 1048, 1056–57 (2d Cir.1984) (citing *United States v. Addonizio,* 442 U.S. 178, 184–85, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) and *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)); *Porcelli v. U.S.,* 964 F.2d 1306 (2d Cir.1992) (movant was not entitled to relief on the basis of alleged intervening change in the law because the subsequently decided case was distinguishable).

#### 2. Extraterritorial Application of section 10(b)

■■■■ Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

does not apply to extraterritorial conduct—whether criminal or civil liability is sought. *See U.S. v. Vilar*, 729 F.3d 62 (2d Cir.2013). The extraterritorial limits of section 10(b) were addressed by the Supreme Court in 2010. *See Morrison v. National Australia Bank*, 561 U.S. 247, 130 S.Ct. 2869, 2884, 177 L.Ed.2d 535 (2010) ("section 10(b) does not punish deceptive conduct, but only deceptive conduct in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.") (internal quotations omitted). Determining whether a security is registered on an American exchange is straightforward. To address the more difficult question of how to classify a "security not so registered," the Court developed a new, transaction-based test. *Id.* It identifies the transaction as domestic or foreign by asking whether a purchase or sale is made in the United States. *See id.* at 2886.

Since *Morrison*, courts have struggled to define what constitutes a "domestic transaction." *See, e.g., Absolute Activist v. Ficeto*, 677 F.3d 60, 67 (2d Cir.2012) ("While Morrison holds that § 10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale."). The Court of Appeals for the Second Circuit has determined that a transaction is domestic "if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67. To identify when irrevocable liability is incurred, the court must determine the "time when the parties to the transaction are committed to one another." *Id.* at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972)).

Application of *Morrison* and its progeny has been expanded to include criminal cases. *See Vilar*, 729 F.3d at 67,

68. A defendant facing securities fraud charges may be convicted only if "he has engaged in fraud in connection with (1) a security listed on a United States exchange, or (2) a security purchased or sold in the United States." *Vilar*, 729 F.3d at 67. If the security is not listed on a United States exchange, *Morrison's* transaction test must be applied to determine if "defendants engaged in fraud in connection with a domestic purchase or sale of securities, in violation of section 10(b) and Rule 10b5." *Vilar*, 729 F.3d at 76. This inquiry is fact specific and often "does not admit of an easy answer." *Morrison*, 130 S.Ct. at 2892 (Stevens, J. & Ginsburg, J., concurring in judgment but disagreeing with test adopted by majority) ("[T]he real question in this case is how much, and what kinds of, domestic contacts are sufficient to trigger application of § 10(b).").

### 3. Domestic Transaction Defined

#### i. Morrison

In *Morrison*, foreign investors brought a civil action against a foreign corporation for securities fraud relating to securities traded on foreign exchanges. *See Morrison*, 130 S.Ct. at 2875. Australian investors purchased shares in an Australian bank whose stock shares were listed on the Australian Stock Exchange Limited. *See id.* at 2875–76. Some executives at the bank had manipulated the financial models of a subsidiary, causing the subsidiary's income stream to appear more valuable than it really was. *See id.* at 2876. The resulting write-downs caused the bank's share price to drop. *See id.* at 2875–76. The Court held that because the case did not involve securities listed on a domestic exchange, and because all aspects of the purchases occurred abroad, section 10(b) could not apply and the complaint must be dismissed. *See id.* at 2888.

### ii. Absolute Activist

In *Absolute Activist*, the Court of Appeals for the Second Circuit held that plaintiffs in a civil case must "allege facts indicating that irrevocable liability was incurred or that title was transferred in the United States." *Absolute Activist*, 677 F.3d at 62. The initial complaint did not sufficiently allege domestic transactions, but the plaintiffs were given "leave to amend the complaint to assert additional facts suggesting that the transactions at issue were domestic." *Id.* at 62. Helpful to the complaint would have been facts including, but not limited to, "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money...." *Id.* at 70. Insufficient were plaintiff's mere assertions that the transactions were domestic. *See id.* Allegations of heavy marketing in the United States, a party's residency or citizenship, and the fact that the deception may have originated in the United States were insufficient to support a section 10(b) claim. *See id.*

### iii. Vilar

In *Vilar*, defendants were found guilty by a jury of a number of crimes including securities fraud. *See Vilar*, 729 F.3d at 67. Defendants worked at a United States-based investment advisory firm that was registered with the Securities and Exchange Commission. *See id.* at 67. This firm was founded by defendants. *See id.* Defendants urged an investment program promising a "high, fixed rate of interest over a set term" in safe products such as United States Treasury bills. *Id.* Instead, defendants invested their clients' money in volatile technology and biotechnology stocks. *See id.* When the bubble burst, defendants' clients lost millions of dollars. *See id.*

Defendants also perpetrated a different fraud on a single investor who was told her investment would be placed in a Small Business Investment Company. *See id.* As soon as the client funds were deposited, defendants began drawing on them to pay various personal and business obligations. *See id.*

The commitment to, and execution of, documents related to the investments demonstrated a domestic purchase or sale. *See id.* at 71. The record reflected that the defendants entered into and renewed agreements with clients when both parties were in the United States. *See id.* at 70.

The issue of the domestic or foreign nature of defendants' transactions with their victims was not before the *Vilar* jury. The Court of Appeals for the Second Circuit found that "the error made manifest by *Morrison's* change in law would not have altered the outcome of the jury's determinations." *Id.* at 78. It found that the "record contain[ed] facts 'concerning the formation of the contracts' and 'the exchange of money,' which are precisely the sort that we indicated may suffice to prove that irrevocable liability was incurred in the United States." *Id.* at 78 (quoting *Absolute Activist*, 677 F.3d at 70).

### 4. Application of Law to Facts

■ ARS were not listed on a United States exchange. There is an ambiguity as to the location of the transactions. Application of *Morrison* to the instant case centers around whether the transactions involved a purchase or sale of securities in the United States.

Movant claims that the transactions were foreign and as a result Rule 10(b) of the Securities Exchange Act does not apply. *See generally* Pet'r's Supplemental Mem. of Law, CM/ECF No. 11. The evidence in support of movant's argument is largely based on the office location of the six clients that testified at trial. *See id.* at 5–10. Movant has listed each client and

emphasized the address the client used to complete relevant documents. *See id.* Similar emphasis is placed on the location to which paper confirmations were mailed and the location of meetings held between movant and his clients. *See id.*

The government argues that the transactions were domestic. *See* Hr'g Tr. 33:16–20. It relies on evidence in the form of contracts, such as account opening documents, American bank accounts designed for the purpose of purchasing securities, and upon tax forms. Mem. in Opp'n at 33. Evidence grounded in similar contacts has been persuasive of a United States connection in similar cases. *See, e.g., Absolute Activist,* 677 F.3d at 70; *Vilar,* 729 F.3d at 71.

The location of the clients' offices is not dispositive. *Absolute Activist,* 677 F.3d at 69 ("While it may be more likely for domestic transactions to involve parties residing in the United States, a purchaser's citizenship or residency does not affect where a transaction occurs . . ."). Butler often met abroad with potential clients to present them with the benefits of entering the market for ARS backed by student loans. There is no evidence showing that any agreements were executed at these meetings abroad, nor is there evidence of a "meeting of the minds," *Absolute Activist,* 677 F.3d at 68, during such in-person meetings. Potential clients merely received arguments in the meetings abroad. Butler, from his office in New York, then followed-up with potential clients, pressing them to invest. Clients had to evaluate the needs of the company, seek approval from management, and update investment policies to reflect investment strategy. Months after the in-person meetings, potential clients became actual clients.

Once a company decided to invest through Butler, multiple documents were executed by the parties from their respec-

tive office locations. It would be unreasonable to consider a transaction foreign just because a foreign client executed a contract abroad. The execution of contracts where two parties physically sit in different cities, states, countries, or continents and exchange a document electronically is now a standard way of doing business. *Cf. Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 30 (2d Cir.1996) (In analyzing whether a defendant transacted business in New York for jurisdictional purposes, the court pondered whether "in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of critical consequence"); *Aquiline Capital Partners LLC v. FinArch LLC,* 861 F.Supp.2d 378, 388 (S.D.N.Y.2012) ("Physical presence . . . is neither dispositive nor critical to establishing personal jurisdiction.").

Contracts were not executed with both parties present in a single location. There was no "meeting of the minds" when both parties were physically present in a single location. Instead, Butler bought and sold securities from the Credit Suisse office in New York. The ARS trading was conducted between Butler, the liaison desk at Credit Suisse's New York office, and other United States Banks (i.e. Merrill Lynch). He made these purchases and sales on behalf of his clients, pursuant to instructions made to him in New York over the phone or through email. Once an instruction from the client was received, Butler, as American based agent of the client, acted, creating irrevocable liability in the United States.

Because the transactions at issue were primarily domestic, section 10(b) was applicable. Movant's claim for relief based upon change of law is denied.

### D. Wire Fraud Conspiracy

#### 1. Law

 The elements of substantive wire fraud are "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires." *United States v. Pierce,* 224 F.3d 158, 165 (2d Cir.2000). "[T]he wire fraud statute punishes frauds executed in interstate or foreign commerce ... so this is surely not a statute in which Congress had only domestic concerns in mind." *Pasquantino v. U.S.,* 544 U.S. 349, 371–72, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (internal quotations omitted).

#### 2. Application of Law to Facts

Movant argues that the government did not offer proof of a violation of foreign law at trial. Pet'r's Br. at 35. Pursuant to the relevant statute, such proof is not required. *See* 18 U.S.C. § 1343. In *Pierce,* the prosecution failed to show that the Canadian government imposed a tax on liquor transported into Canada; thus no scheme to defraud the Canadian government existed. *See Pierce,* 224 F.3d at 166–68 ("[T]he government cannot prove a scheme to defraud the Canadian government because there is no evidence whatsoever of a property right— a right to revenue—of which the Canadian government could be defrauded."). The government's failure to demonstrate that Canada had a tax in place was fatal. *See id.* at 166.

Unlike *Pierce,* a question of foreign law is not implicated here. The decision that the ARS transactions were domestic, rather than foreign, removes the need to consider foreign law.

The jury properly found wire fraud conspiracy. The government showed that Butler deprived his clients of their property through a scheme to defraud and that the scheme was furthered by wire.

### VI. Certificate of Appealability

The petition is dismissed on the merits. No constitutional violation has been shown. A certificate of appealability is granted because the concept of territoriality is in flux. The procedural bar may be held by the appellate court under the circumstances of this case as not applicable. *See* 28 U.S.C. § 2253(c)(1)(B).

### VII. Conclusion

The section 2255 motion is denied. The motion for a new trial is denied. A certificate of appealability is granted for the reasons stated in Part VI. No costs or disbursements are awarded.

SO ORDERED.